# Illinois Official Reports

## Appellate Court

*Selby v. O'Dea*, 2020 IL App (1st) 181951

| | |
|---|---|
| Appellate Court Caption | FRANK SELBY, MARTIN YOUNG, ADRIANA LOPEZ, and KATHERINE SCHEIWE, n/k/a Katherine Polk, Individually and on Behalf of All Others Similarly Situated, Plaintiffs-Appellants, v. JAMES M. O'DEA, Individually and d/b/a James M. O'Dea & Associates, and STATE FARM MUTUAL AUTO INSURANCE COMPANY, Defendants (State Farm Mutual Auto Insurance Company, Defendant-Appellee). |
| District & No. | First District, Third Division<br>No. 1-18-1951 |
| Filed | March 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-43684; the Hon. Rodolfo Garcia and the Hon. Raymond Mitchell, Judges, presiding. |
| Judgment | Affirmed in part, reversed in part, and vacated in part; cause remanded. |
| Counsel on Appeal | Grace E. Wein, of Wein & Associates, P.C., of Chicago, for appellants.<br><br>James P. Gaughan, of Riley Safer Holmes & Cancila LLP, of Chicago, for appellee. |

PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Howse concurred in the judgment and opinion.


# OPINION

¶ 1    State Farm Mutual Auto Insurance Company (State Farm), represented by attorney James O'Dea, filed subrogation claims against Frank Selby, Martin Young, Adriana Lopez, and Katherine Scheiwe. Those individuals, the plaintiffs in this case, then flipped the script and sued State Farm and O'Dea for fraud, abuse of process, conspiracy (to commit abuse of process), and malicious prosecution. They claim that State Farm and O'Dea conducted a scheme to obtain fraudulent default judgments against plaintiffs by using improper service of process. And they claim they are not alone; they seek to certify a class of former subrogation defendants similarly mistreated.

¶ 2    Both State Farm and O'Dea filed dispositive motions. O'Dea's failed, and plaintiffs' claims against him are still pending in the circuit court. But the trial court granted State Farm's combined motion for dismissal and summary judgment, dismissing the abuse-of-process claims and awarding summary judgment to State Farm on the claims of civil conspiracy and malicious prosecution.

¶ 3    The first time this matter came before us, a discovery dispute took center stage. Plaintiffs had sought any joint communications between State Farm, O'Dea, and their respective attorneys concerning the defense of this lawsuit. The then-trial judge ruled that those communications were protected by what it called a "joint defense privilege." We agreed that these communications were not subject to disclosure, reasoning that while these joint communications might normally result in the waiver of attorney-client privilege, we would recognize an exception to waiver when the parties were discussing matters of litigation in their common interest. We thus recognized a common-interest exception to the waiver rule, an exception recognized in most jurisdictions throughout the country but not in Illinois until our decision.

¶ 4    But while the trial judge ruled generally that these communications were protected from disclosure, our view was that the trial court should have conducted an *in camera*, communication-by-communication review to determine whether each communication was or was not subject to disclosure. As the trial court had not done so, we remanded the matter for that *in camera* review.

¶ 5    Notably, we also vacated the orders of dismissal and summary judgment, recognizing the possibility that some new information might become available to plaintiffs following that *in camera* review and having no idea, obviously, whether that new information might make a difference in the outcome of the dispositive motions. We made it clear, however, that we expressed no opinion on the merits of those dispositive rulings.

¶ 6    On remand, a new judge was assigned to the case following his predecessor's retirement. The trial court conducted an *in camera* review, determined that all communications between State Farm, O'Dea, and their lawyers were protected from disclosure, and thus reinstated the orders of dismissal and summary judgment entered by the previous judge.

¶ 7    Though plaintiffs attack the methods by which the trial judge proceeded on remand, we find no error. The trial judge did exactly what we ordered; it held an *in camera* hearing, determined (properly so, in our view) that no information was subject to disclosure, and thus reentered the orders of dismissal and summary judgment in State Farm's favor. From a procedural standpoint, we thus find no error in the new judge's handling of matters.

¶ 8    But now, for the first time, we are substantively reviewing the previous judge's orders, reinstated by the new judge, that dismissed the abuse-of-process claims and entered summary judgment in favor of State Farm on the claims of malicious prosecution and civil conspiracy.

¶ 9    We affirm summary judgment in favor of State Farm on the malicious prosecution claim. But we reverse the dismissal of the abuse-of-process claims, as we find that plaintiffs pleaded sufficient facts to establish State Farm's vicarious liability for O'Dea's alleged abuse of process. And we vacate the grant of summary judgment on the conspiracy count, as we find, for various reasons, that State Farm's right to judgment as a matter of law is not clear and free from doubt.

¶ 10                                   BACKGROUND

¶ 11   State Farm issues automobile insurance policies to consumers in the state of Illinois. It routinely initiates subrogation claims against third parties after paying money to its insureds on claims. To prosecute its portfolio of subrogation claims, State Farm retains outside attorneys.

¶ 12   One of those attorneys representing State Farm in those subrogation cases was defendant O'Dea and his law firm, James M. O'Dea and Associates. And among those who were sued in these subrogation actions by State Farm, via O'Dea, were plaintiffs Selby, Young, Lopez, and Scheiwe.

¶ 13   Plaintiffs (minus Scheiwe) filed suit in October 2010. After rounds of motion practice and amendments, and the addition of Scheiwe as a party-plaintiff, plaintiffs filed the operative pleading here, the third amended complaint (the complaint).

¶ 14   We will have more to say about the abuse-of-process claims (one for each named plaintiff) below. Suffice it to say here, in a nutshell, that beginning in May 2007, O'Dea embarked on a scheme to obtain bogus default judgments in subrogation cases on State Farm's behalf.

¶ 15   First, instead of initially processing his summons through the Cook County Sheriff (Sheriff), O'Dea went straight to seeking the appointment of a special process server, in violation of local court rules (if not state law). Second, though he moved the court to appoint a special process server (a private detective), he did not actually use that licensed process server but, instead, used his former brother-in-law, who was not licensed, to serve the summons.

¶ 16   Third, the "verified" complaints that O'Dea filed on State Farm's behalf were not, in fact, verified because they were signed by State Farm employees, not the underlying insureds who would have personal knowledge of the events that resulted in the accidents. But because they were filed as "verified" complaints, O'Dea was able to obtain default judgments after the subrogation defendants (who had never been properly served, if served at all) failed to answer or appear in a timely fashion. As a result of this abuse of process, O'Dea was able to obtain default judgments against individuals who were improperly (if ever) served. O'Dea thus secured fraudulent default judgments against these subrogation defendants.

¶ 17    On top of that, the complaint alleges, though he never actually used the Sheriff, O'Dea charged, as a cost of suit, the fee the Sheriff charges for service of process. If only a single defendant is served, that cost is $60, but the Sheriff charges per defendant, even if multiple defendants reside at the same address, so the fee could double or triple if multiple defendants were sued. All of these improper charges, says the complaint, were stacked on top of the underlying default judgment award against these subrogation defendants.

¶ 18    The abuse-of-process claims further allege that State Farm participated in or later ratified this unlawful conduct, rendering State Farm vicariously liable for O'Dea's misconduct.

¶ 19    The civil-conspiracy claim largely mirrored the abuse-of-process claim, though it added the allegation that, after certain judges had become wise to O'Dea's improper use of substitute process servers, O'Dea began issuing jury demands (at State Farm's direction) to move the cases to a different courtroom with judges who were not familiar with his tactics.

¶ 20    The malicious prosecution claim, brought only by Scheiwe, alleges that State Farm's subrogation lawsuit against Scheiwe was time-barred and thus, the filing of the claim, itself, amounted to malicious prosecution.

¶ 21    As noted, the previous trial judge dismissed the abuse-of-process claim against State Farm. The court granted summary judgment to State Farm on the claims of civil conspiracy and malicious prosecution.

¶ 22    Plaintiffs appealed, claiming several errors in the trial court's orders. We settled some of the questions in the first appeal. Among those was whether State Farm was required to produce information responsive to Interrogatory No. 12, concerning joint communications between State Farm, O'Dea, and their respective lawyers that took place after the filing of this lawsuit. We agreed with the trial court that these communications were generally protected from disclosure but remanded for an *in camera*, communication-by-communication analysis of whether each specific communication was protected from disclosure.

¶ 23    Among the issues we did *not* reach in the first appeal were the merits of the court's orders of dismissal and summary judgment. We vacated those rulings only because we did not know, at that moment, what would come of the *in camera* inspection on remand. We did not know whether new information would come to light that might allow plaintiffs to plead new allegations or add new facts in opposition to summary judgment. We expressed no opinion on the merits of those dispositive rulings.

¶ 24                                    ANALYSIS

¶ 25                                         I

¶ 26    That brings us to the first issue raised on appeal, relating to how the trial court conducted matters on remand. And that issue, itself, breaks into two parts: how the trial court conducted the *in camera* proceedings regarding the joint communications and the trial court's disposition of the orders of dismissal and summary judgment. In each case, say plaintiffs, the trial court violated our mandate.

¶ 27                                         A

¶ 28    We start with the *in camera* proceedings. But we must back up and provide some context from our original opinion in *Selby v. O'Dea*, 2017 IL App (1st) 151572. The issue that consumed most of our analysis, the common-interest exception to the waiver rule, was

spawned by this interrogatory—Interrogatory 12—that plaintiffs propounded on State Farm: " 'Did State Farm ever notify, or advise, from January 1, 2006 *to the present*, either in writing or orally, [O'Dea] that there were any irregularities discovered in the handling of the State Farm subrogation matters?' " (Emphasis in original.) *Id.* ¶ 15.

¶ 29    State Farm objected to this interrogatory on several bases, including the "joint defense privilege" (*id.* ¶ 16), which led to our lengthy discussion of the attorney-client privilege, waiver of the privilege, and exceptions to the waiver rule.

¶ 30    We agreed that any joint communications between State Farm, O'Dea, and their respective lawyers concerning the defense of this lawsuit *could* be protected from disclosure under the common-interest exception to the waiver rule, but we held that such a finding could not be made in blanket fashion and that the trial court should examine, *in camera*, each communication to determine whether it fell within this exception. Thus, we remanded the matter to the trial court for that *in camera* inspection. See *id.* ¶¶ 107-112. We deliberately did not dictate to the trial court how to handle this rather unique situation of determining the application of a privilege waiver (or an exception thereto) to purely oral conversations.

¶ 31    On remand, counsel for State Farm produced a privilege log to plaintiffs of all "Joint Defense Communications Referenced in Response to Interrogatory No. 12." The privilege log contained two entries.

¶ 32    The first reflected a December 9, 2010, oral communication between outside attorneys for State Farm (Messrs. Gaughan and Cancila), in-house counsel for State Farm (Mr. Echols), counsel for O'Dea (Mr. Yu), and O'Dea himself. The privilege log described the communications as follows: "Review allegations of the initial complaint, verification of common interest, and identification of joint defense strategies to obtain dismissal of case (as more fully described in the affidavit of James Gaughan, to be submitted to the court for an *in camera* review)."

¶ 33    The second entry reflected a May 20, 2011, oral communication, where the same individuals were present. The privilege log's description of this conversation stated: "Review of allegations of second amended complaint, verification of common interest, and identification of joint defense strategies to obtain dismissal of the case (as more fully described in the affidavit of James Gaughan, to be submitted to the court for an *in camera* review)."

¶ 34    As promised (and ordered by the trial court), Mr. Gaughan then submitted an affidavit to the court for its *in camera* inspection. The affidavit explained that these two different conversations took place between State Farm, O'Dea, and their respective lawyers after the filing of this complaint and concerning the defense of this action. The affidavit explained who was present for each conversation, what was discussed, and the fact that nobody memorialized the substance of these conversations (meaning there were no documents).

¶ 35    After reviewing the affidavit, the trial court was satisfied that neither instance of joint communication resulted in a waiver of the attorney-client privilege and that each conversation was protected by the common-interest exception to the waiver rule. As such, the trial court saw no need to revisit the predecessor judge's orders of dismissal and summary judgment in favor of State Farm. The trial court reinstated those orders and later entered language under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) to allow appeal of these rulings while the case pended against O'Dea in the trial court.

¶ 36 Before we go any further on matters of procedure, we find that, as a matter of *substance*, the trial court's ruling on the application of the common-interest exception was correct. In our first opinion, we summarized our holding as follows:

> "[T]he common-interest exception to the waiver rule protects from disclosure to third parties those statements made to further the parties' common interest, pursuant to a common-interest agreement, (1) by the attorney for one party to the other party's attorney, (2) by one party to the other party's attorney, (3) by one party to its own attorney, if in the presence of the other party's lawyer, and (4) from one party to another, with counsel present." *Selby*, 2017 IL App (1st) 151572, ¶ 105.

The communications documented in the Gaughan affidavit fall within this common-interest exception: the conversations took place pursuant to an agreement the parties styled as a "joint defense agreement," they concerned the defense of the lawsuit, and they took place between the clients and their lawyers.

¶ 37 Plaintiff raises two errors in how the trial court proceeded. First, they complain about the scope of the *in camera* inquiry. They say that *all* joint communications between O'Dea, State Farm, and their lawyers should have been disclosed, not just those responsive to Interrogatory No. 12.

¶ 38 The trial court correctly noted, however, that our opinion was limited to Interrogatory No. 12, recited above. Granted, we never specifically identified that interrogatory by number in our original opinion, but we quoted it (*id.* ¶ 15) and paraphrased it (*id.* ¶ 89). We consistently referred not to discovery in general or even interrogatories writ large, but rather to "[t]he interrogatory in this case" (*id.*), to "that interrogatory" (*id.* ¶ 16), and to "this interrogatory" (*id.*). We discussed the content of "the interrogatory itself" (*id.* ¶ 108), the substance of "State Farm's response to the interrogatory" (*id.* ¶ 97), and the "communications identified by State Farm in that interrogatory response" (*id.* ¶ 107).

¶ 39 And despite our rather sweeping discussion of the common-interest exception to the waiver rule, we did *not* reach the question of whether joint communications between clients, *without* counsel present, would be covered by the exception, for the very reason that "State Farm's response to the interrogatory" stated that "every communication 'involve[d]' counsel." *Id.* ¶ 97. Based on the response to that specific interrogatory, in other words, we declined to reach a sub-issue that might otherwise arise on the question of the common-interest exception.

¶ 40 Our entire analysis was framed by that specific interrogatory and State Farm's response to that interrogatory. The trial court correctly understood it as such and properly limited the *in camera* proceedings to communications responsive to Interrogatory No. 12.

¶ 41 Plaintiffs also complain of the Gaughan affidavit, noting that "[a]n *in camera* review generally consists of a review of documents or communications that were already in existence," and that "[r]eview of a document that was created solely for an audience of one— the trial court—and shielded from the opposing counsel is by definition an *ex parte* communication."

¶ 42 True, *in camera* reviews usually consist of a review of documents, but this case was unique in that regard. State Farm swore under oath in its response to Interrogatory No. 12, and Mr. Gaughan swore under oath in his affidavit, that no documents responsive to that interrogatory existed—that nobody reduced the oral conversations to writing.

¶ 43     The trial court thus found itself, if not in uncharted waters, certainly in unusual ones. It is not every day that an *in camera* examination consists of purely oral conversations. So what was the new, beleaguered trial judge to do with this gift we bequeathed him?

¶ 44     As the trial court correctly noted, there was more than one way to proceed. The trial court could have conducted a hearing in chambers, with the parties to the joint conversation examined on the subject, without plaintiffs or their counsel present. See, *e.g.*, *In re John Doe, Inc.*, 13 F.3d 633, 635 (2d Cir. 1994) (*in camera* testimony by attorney regarding discussions with client was appropriate to determine whether the crime-fraud exception to attorney-client privilege applied).

¶ 45     But requiring one of the parties to the joint communication to submit an affidavit detailing the sum and substance of those communications was certainly another option. See, *e.g.*, *Colt Industries, Inc. v. Aetna Casualty & Surety Co.*, CIV.A. No. 87-4107, 1989 WL 35462, at *3 (E.D. Pa. Apr. 12, 1989) (ordering defendant to "submit for *in camera* review *** a specific statement as to the nature of the oral testimony alleged to be privileged"). Either one, in our view, would have been acceptable. See *Marsh v. Safir*, No. 99CIV.8605JGKMHD, 2000 WL 460580, at *15 (S.D.N.Y. Apr. 20, 2000) (noting that, while unusual, courts have conducted *in camera* reviews of oral communications, "either by affidavit or by oral testimony, whenever they have deemed such a procedure to be helpful to an assessment of a party's privilege claim").

¶ 46     But as the trial court aptly noted in addressing plaintiff's counsel on this question, after detailing these various possibilities, "in any of those proceedings, *** the one person who isn't going to be involved is you." Indeed, the very nature of an *in camera* proceeding (at least one of this nature) is that one side to the case is not involved. So the fact that the Gaughan affidavit was generated for this very purpose is of no import. The trial court had to have some way of receiving this information from State Farm, and regardless of whether it was a written affidavit or oral testimony, it would, by definition, be withheld from plaintiffs' counsel.

¶ 47     We thus find no improper *ex parte* communication here. We find no error whatsoever in how the trial court handled these *in camera* proceedings.

¶ 48                                                     B

¶ 49     Plaintiffs next claim that the trial court did not comply with our mandate on remand when, after finding that no additional information would come of its *in camera* review, it merely reinstated the orders of dismissal and summary judgment.

¶ 50     As we have said more than once, we vacated the orders of dismissal and summary judgment in State Farm's favor only because we recognized the possibility that the court's *in camera* inspection might lead to the discovery of new information that plaintiffs could plead in support of their dismissed claims or on which plaintiffs could rely in opposition to State Farm's motion for summary judgment. It would thus be premature for us to rule on issues when the possibility remained that plaintiffs would have additional facts and arguments for our (and the trial court's) consideration. *Selby*, 2017 IL App (1st) 151572, ¶¶ 124-25. We made it clear that we were expressing no opinion on the merits of these dispositive rulings. *Id.* ¶ 125.

¶ 51     On remand, after finding that the joint communications would not be subject to disclosure, the trial court reinstated the orders of dismissal and summary judgment in State Farm's favor. The court wrote: "In the absence of new facts coming to light as a result of the *in camera*

review ordered by the appellate court, the [predecessor judge's] rulings would stand." From the context of its order, there is absolutely no question that the trial court was reentering the previous orders of dismissal and summary judgment in State Farm's favor. And if any doubt could have possibly existed, the court's inclusion of Rule 304(a) language, to make its final judgment appealable while the action remained pending in the circuit court against O'Dea, confirmed this fact.

¶ 52    Plaintiffs make much of the fact that the trial court referred to our vacatur of the dispositive orders as "conditional," when in fact, say plaintiffs, it was unequivocal. But we understand what the trial court meant. In context, the trial court was saying that nothing in our first opinion foreclosed the trial court from merely reinstating the orders of dismissal and summary judgment—if, that is, no new information became discoverable after the *in camera* hearing. And that is precisely what we intended to convey.

¶ 53    True, we did not *order* the trial court to automatically reinstate the judgments on remand, if it found that no new information should be disclosed. That would have been inappropriate, as trial courts always retain the discretion to reconsider interlocutory orders, whether their own or those of a predecessor judge. *Hernandez v. Pritikin*, 2012 IL 113054, ¶ 42; *Balciunas v. Duff*, 94 Ill. 2d 176, 185 (1983). Though we did not know that the predecessor judge would retire, we never would have foreclosed the possibility that either Judge Garcia or his successor might choose to reconsider these rulings for one reason or another.

¶ 54    But neither did we require it. The new judge chose to adhere to the original orders of dismissal and summary judgment. Nothing in our original opinion precluded him from doing so.

¶ 55    From a procedural standpoint, we find no error in the trial court's conduct of proceedings on remand. The trial court complied fully with our mandate.

¶ 56                                                    II

¶ 57    We now turn to the substance of the dispositive rulings, originally entered by the predecessor judge and reinstated by the current one. And we begin with the order dismissing the abuse-of-process claims.

¶ 58    A section 2-615 motion (735 ILCS 5/2-615 (West 2018)) challenges the legal sufficiency of a complaint. *Roberts v. Board of Trustees of Community College District No. 508*, 2019 IL 123594, ¶ 21. We accept all well-pleaded facts as true and draw all reasonable inferences from them in the plaintiff's favor. *Doe v. Coe*, 2019 IL 123521, ¶ 20. Dismissal is appropriate only if "it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recover." *Roberts*, 2019 IL 123594, ¶ 21.

¶ 59    But facts, themselves, must be pleaded. Bare conclusions of law, or conclusory factual allegations that parrot the elements of a cause of action without underlying factual support, are not taken as true in considering a section 2-615 motion to dismiss. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 498 (1996); *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 35; *Time Savers, Inc. v. La Salle Bank, N.A.*, 371 Ill. App. 3d 759, 767 (2007).

¶ 60    Abuse of process is the misuse of legal process to accomplish some purpose outside the scope of the legal process itself. *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 339 Ill. App. 3d 177, 182-83 (2003). The elements are (1) an improper motive and (2) some act in the use of legal process that is improper in the regular prosecution of proceedings. *Id.*; *Kumar v.*

*Bornstein*, 354 Ill. App. 3d 159, 165 (2004). To show an improper purpose, the plaintiff must plead facts showing that the defendant instituted proceedings against the plaintiff for a purpose "such as extortion, intimidation, or embarrassment." *Kumar*, 354 Ill. App. 3d at 165. The second element requires proof that "the process was used to accomplish some result that is beyond the purview of the process." *Id.*

¶ 61        "Process" is any means by which the court acquires jurisdiction over a defendant, including, quite obviously, the issuance of summons, the most common means. *Goldman*, 339 Ill. App. 3d at 183. The mere issuance of summons, by itself, does not constitute abuse of process, but "a fraudulent and malicious manipulation of service of summons might constitute an abuse of process." *Id.* at 184.

¶ 62        The complaint here alleges that State Farm's attorney, O'Dea, committed the tort of abuse of process by using improper means of obtaining default judgments against various subrogation defendants, including plaintiffs. He did so by using improper service of process on the subrogation defendants and by filing "verified" complaints that, in fact, were not "verified" at all but that were then used to support successful motions for default judgment.

¶ 63        The trial court did not dismiss the abuse-of-process claims as to O'Dea, thus indicating that the complaint properly alleged the elements of the claim. But it dismissed the claims as to State Farm on the grounds that State Farm, the client, was not vicariously liable for the legal maneuvers of O'Dea, the attorney it entrusted to handle these subrogation claims. That is where the issue joins on appeal as well; State Farm does not dispute that the rote elements of the claim were adequately pleaded as to O'Dea but argues that the complaint failed to plead State Farm's vicarious liability. So we begin there.

¶ 64                                          A

¶ 65        "As a general rule," attorneys are considered both independent contractors and agents of the client. *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 13 (2004). They are agents in that they owe a fiduciary duty to their clients and bind their clients by the actions they take. *Id.* They are independent contractors in that they exercise "independent professional judgment" and have "considerable autonomy over the details and manner of performing their work." *Id.*

¶ 66        But given the degree of independence and autonomy attorneys typically enjoy in the service of their clients, many of whom know little or nothing about the niceties of legal practice, we deem lawyers to be independent contractors when it comes to imposing liability on clients for the intentional tortious conduct of their attorneys. *Id.* Thus, the rule:

> "where a plaintiff seeks to hold a client vicariously liable for the attorney's allegedly intentional tortious conduct, a plaintiff must prove facts demonstrating either that the client specifically directed, controlled, or authorized the attorney's precise method of performing the work or that the client subsequently ratified acts performed in the exercise of the attorney's independent judgment." *Id.* at 13-14.

¶ 67        The complaint alleges that O'Dea was State Farm's agent. But even if a naked allegation of agency were enough to satisfy the requirement of factual pleading (it is not; see *Connick*, 174 Ill. 2d at 498), in light of the rule in *Horwitz*, a claim of agency alone gets plaintiffs nowhere. They must plead sufficient facts to demonstrate that State Farm directed, controlled, or authorized O'Dea's precise method of performing the work, or that State Farm later ratified

these acts.

¶ 68                                    B

¶ 69    Though we previewed the essentials of the abuse-of-process claims earlier, we drill down in more detail here before determining whether the complaint adequately pleads State Farm's vicarious liability.

¶ 70    At all relevant times, O'Dea was an attorney retained by State Farm to handle its subrogation claims in Cook County. O'Dea's wife, Patricia O'Dea, was an employee of State Farm during this time. And Patricia's mother worked at O'Dea's law firm.

¶ 71    Before some time in 2007, O'Dea would initiate subrogation claims on State Farm's behalf by placing process with the Sheriff, the officer to whom state law defaults. See 735 ILCS 5/2-202(a) (West 2006).

¶ 72    The complaint alleges that state law and the rules of the Illinois Supreme Court require that service of process first be placed with the Sheriff. See *id.*; Ill. S. Ct. R. 102(a) (eff. Jan. 1, 2018). We do not necessarily read state law and Rule 102(a) the same way. See 735 ILCS 5/2-202(a-5) (West 2006) (allowing for appointment of special process server in court's discretion, without stated requirement that sheriff first seek service); Ill. S. Ct. R. 102(a) (eff. Jan. 1, 2018) (requiring summons to be served by "the sheriff or other officer or person authorized to serve process").

¶ 73    Resolution of that legal question is unnecessary, however, because regardless, the complaint alleges that the municipal division of the circuit court of Cook County required, as a precondition to the appointment of a special process server, that the plaintiff indicate the dates that the Sheriff attempted unsuccessfully to serve process.

¶ 74    And at some point in 2007, O'Dea began evading this requirement when filing subrogation actions for State Farm. He stopped using the Sheriff for service of process altogether. In many cases, he would obtain a special process server by misrepresenting facts on the motion for appointment of a special process server, falsely claiming to have first attempted service via the Sheriff. In other cases, O'Dea did not even bother with a motion and simply used a special process server directly, without leave of court.

¶ 75    And for those instances in which O'Dea obtained leave to appoint a special process server, O'Dea did not ultimately use the appointee listed in his motion, a private detective named Edward Sonne. Instead, O'Dea used his former brother-in-law, Rickey Dixon, who was not licensed to serve process (and who, the complaint alleges, had recently become unemployed). So whether he followed the process for seeking the appointment of a special process or he bypassed that requirement altogether, in either case, O'Dea used a special process server who was not authorized by the court or by state law to serve process.

¶ 76    Despite knowing that he had not obtained jurisdiction over these subrogation defendants, including the four named plaintiffs herein, O'Dea moved for default judgments against them. To accomplish that, O'Dea needed some verification of damages—which leads us to another alleged abuse of process. The complaint alleges that O'Dea filed "verified" complaints that, in fact, were not "verified" in any meaningful sense. The verifications were signed by employees of State Farm, who lacked personal knowledge of the underlying facts of the car accident and could only verify the amount of money State Farm paid out on the insured's claim. They could not, in other words, "verify" that the subrogation defendant had engaged in negligent conduct

that led to the automobile accident; they could only verify that State Farm was a proper subrogated party.

¶ 77    In all of these ways, then, O'Dea was able to secure improper default judgments against subrogation defendants. He violated the rules for service of process. As a result, he either did not serve the subrogation defendants properly, if at all, but claimed that he did. Then he used improperly "verified" complaints to secure default judgments against subrogation defendants who had not appeared in the case and, in some instances at least, did not even know they had been sued.

¶ 78    As part of the default judgment, of course, O'Dea sought his costs of suit. He included in those costs the $60 fee charged by the Sheriff, even though O'Dea had not used the Sheriff. And because the Sheriff charges by the defendant served, even if multiple defendants live together (*e.g.*, a husband and wife), sometimes that $60 fee was multiplied by two or three. The complaint alleges that, given the massive number of cases O'Dea filed, O'Dea made over $50,000 a year in recouping these improper charges.

¶ 79    The complaint further alleges that O'Dea would then file with the Secretary of State a "record of unsatisfied judgment," thus resulting in the suspension of the subrogation defendant's driver's license. In some cases, at least, the complaint alleges that O'Dea filed this record of judgment less than 30 days from the default judgment, while still within the time that a party could timely seek to vacate the default.

¶ 80    O'Dea did not, however, file a copy of this "record of unsatisfied judgment" with the clerk of the circuit court of Cook County, thus hiding from the courts (and from the subrogation defendants) that the driver's licenses of these subrogation defendants had been suspended.

¶ 81    In any event, the complaint alleges that the purpose of suspending the driver's licenses of these unsuspecting subrogation defendants (and plaintiffs herein) was to coerce them into a prompt payment of the default judgment (including costs of suit) so that their right to operate their vehicles would be restored.

¶ 82    In fact, the complaint alleges a conspiracy between State Farm and O'Dea to avoid the scrutiny of certain judges who had begun inquiring into service of process on subrogation cases he had filed. O'Dea, allegedly at the direction of State Farm, began a practice that no other lawyer handling subrogation claims for State Farm did—he started filing jury demands to move the cases to a different courtroom where "an order for a process server did not require a recitation in the order, or a written motion prior to the issuance of that order, that the sheriff had been utilized, nor did it require that the private detective license number be disclosed." That allowed O'Dea to keep using Dixon as a process server.

¶ 83    The complaint alleges State Farm's culpability in this scheme in several ways. First, the complaint alleges that State Farm *agreed* to the plan to bypass the Sheriff for service and use a special process server. It did so for two reasons. One, it would be additional compensation to O'Dea. But more to the point, it would "permit the more expeditious resolution of cases which could be accomplished when defendants were not properly served and were not given an opportunity to defend cases on the merits."

¶ 84    Second, State Farm knew, from a review of O'Dea's files and the bills it paid, that O'Dea was using Dixon, an unlicensed individual, not Sonne, as his special process server. The complaint further alleges that State Farm also had overall knowledge of O'Dea's scheme via O'Dea's wife, a State Farm employee.

¶ 85    Third, according to the complaint, even if State Farm did not agree on the front end to the scheme to bypass the Sheriff but still charge the Sheriff fee as a cost of suit, it knew on the back end and permitted that action. That is, State Farm knew from a review of O'Dea's files that the costs indicated on each file were not consistent with the actual receipts for costs expended.

¶ 86    State Farm portrays itself as a mere client hiring a lawyer, leaving the details of such minute matters of service of process to the attorney. That may ultimately be true. But we are at the pleading stage. The complaint does not allege a hands-off client. It sufficiently alleges that State Farm "specifically directed, controlled, or authorized" O'Dea's precise methods of skirting the rules on service of process or, at a bare minimum, that it ratified his actions after the fact by knowing of his practices, benefitting from them via default judgments, and acquiescing. *Horwitz*, 212 Ill. 2d at 13-15.

¶ 87    As we explained above, the law does not presume that a client will micromanage a lawyer's handling of a case. Some clients do not know the first thing about lawsuits and rely wholly on their lawyers, much as laypeople often know nothing about medical matters and rely entirely on doctors for diagnosis and treatment. These clients would not know anything about the niceties of service of process, if they even knew what "service of process" was at all.

¶ 88    Others are more sophisticated, especially corporate ones with in-house counsel, like State Farm. Indeed, plaintiffs make much of the fact that State Farm is a high-volume purchaser of legal services. Nobody disputes that. In one sense, that supports plaintiffs' position that State Farm is sophisticated enough to keep tabs on one of its lawyers. They cite a federal decision applying Illinois law, where the plaintiffs stated a claim against a debt collector for the actions of its collection lawyer, who allegedly filed debt-collection actions without the required documentation. See *Grant-Hall v. Cavalry Portfolio Services, LLC*, 856 F. Supp. 2d 929, 936 (N.D. Ill. 2012). It was fair to infer at the pleading stage, the court ruled, that the defendant, "as a veteran debt collector and volume purchaser of legal services, has much greater control over its attorneys than does the typical client," that it understood the legal requirements of collecting debt, and that it thus "was aware of and ratified" its lawyer's practice. *Id.* at 942.

¶ 89    We recognize, on the other hand, that being a volume purchaser of often small-recovery cases might mean that the corporate defendant pays *less* attention to each individual case. It is unfair to generalize. And Illinois is a fact-pleading state, as we have noted, with stricter pleading requirements than in federal court, as in *Grant-Hall*.

¶ 90    Still, we draw all reasonable inferences from the well-pleaded facts in favor of plaintiffs. The complaint alleges in several ways that State Farm knew what O'Dea was doing, authorized it, or at least ratified it after the fact. And even if a client like State Farm was not required to micromanage every single case, the complaint alleges that O'Dea filed thousands upon thousands of these cases for State Farm, committing these abuses throughout. Noticing a single discrepancy is one thing; failing to notice the same discrepancy thousands of times is another.

¶ 91    Obviously, we are not saying that any of these allegations are true; we only take them as true at the pleading stage. But they are sufficient to allege that State Farm directed and ratified O'Dea's abuse of process. The abuse-of-process claims should not have been dismissed.

¶ 92                                              III

¶ 93        State Farm also moved for summary judgment on the claims of abuse of process. The trial court never ruled on that motion, having dismissed those counts. State Farm argues that we could consider its motion for summary judgment and affirm the trial court on that basis, as well.

¶ 94        It is true that we may affirm a court's judgment on any basis in the record. *CNA International, Inc. v. Baer*, 2012 IL App (1st) 112174, ¶ 31. But the court's judgment on these claims was one of dismissal. We can affirm *that* judgment on any basis in the record.

¶ 95        But we have no jurisdiction to review a summary judgment motion that was not the subject of a final order. As even State Farm concedes, no order granting summary judgment was ever entered on the abuse-of-process claims. We lack jurisdiction to consider nonfinal orders. *Bauman v. Patterson*, 2018 IL App (4th) 170169, ¶ 37 (denial of summary judgment motion was nonfinal in nature); *Resurgence Financial, LLC v. Kelly*, 376 Ill. App. 3d 60, 62 (2007) (denial of motion for summary judgment is not final order over which appellate court has jurisdiction).

¶ 96                                              IV

¶ 97        Next, we consider whether the circuit court correctly awarded summary judgment to State Farm on Scheiwe's malicious-prosecution claim. Again, she alone alleges that State Farm's subrogation lawsuit against her was time-barred and thus the filing of the claim, itself, amounted to malicious prosecution.

¶ 98        The tort of malicious prosecution seeks recovery for damages resulting from an unsuccessful civil (or criminal) proceeding that was prosecuted " 'without probable cause and with malice.' " *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 23 (quoting *Freides v. Sani-Mode Manufacturing Co.*, 33 Ill. 2d 291, 295 (1965)). Suits for malicious prosecution are " 'not favored in law.' " *Id.* ¶ 24 (quoting *Joiner v. Benton Community Bank*, 82 Ill. 2d 40, 44 (1980)). Generally speaking, Illinois public policy favors "encouraging and protecting those who exercise their constitutional right to appeal to our courts for redress of private or public grievances." *Joiner*, 82 Ill. 2d at 44-45.

¶ 99        To prevail, plaintiffs must prove (1) the commencement or continuance of an original civil judicial proceeding by the defendant, (2) the termination of the proceeding in favor of the plaintiff, (3) the absence of probable cause for such proceeding, (4) the presence of malice, and (5) damages resulting to the plaintiff. *Beaman*, 2019 IL 122654, ¶ 26; *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996). In our view, Scheiwe's malicious-prosecution claim fails because she cannot establish either the second or third elements, which tend to bleed into one another.

¶ 100       We begin with the second element, whether State Farm's subrogation claim against Scheiwe was terminated in her favor. In *Cult Awareness Network v. Church of Scientology International*, 177 Ill. 2d 267, 276 (1997), our supreme court adopted the definition of "favorable termination" contained in section 674 of the Restatement (Second) of Torts. A proceeding is deemed to terminate in favor of the plaintiff if the termination was brought about by "(1) the favorable adjudication of the claim by a competent tribunal, or (2) the withdrawal of the proceedings by the person bringing them, or (3) the dismissal of the proceedings because of his failure to prosecute them." Restatement (Second) of Torts § 674 cmt. j (1977).

- 13 -

¶ 101     What ultimately matters most, our supreme court explained, are the circumstances under which it terminates—that is, whether the disposition "can give rise to an inference of lack of probable cause." *Cult Awareness Network*, 177 Ill. 2d at 278. "In the context of a malicious prosecution case, probable cause is defined as 'a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged.' " *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 654 (2006) (quoting *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 642 (2002)).

¶ 102     Obviously, not every disposition will negate the existence of probable cause. For instance, dismissals that are "based solely on technical or procedural grounds" do not count as a favorable terminations. *Cult Awareness Network*, 177 Ill. 2d at 278 (citing 54 C.J.S., *Malicious Prosecution* § 54 (1987)).

¶ 103     In our view, the dismissal in the subrogation case against Scheiwe falls squarely into the category of "technical or procedural" dismissals that do not shed light on the complaining party's probable cause to initiate the underlying action. Statutes of limitations, as Illinois courts have routinely recognized, are procedural devices. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 351 (2002) ("Statutes of limitations are procedural ***."); *Fredman Brothers Furniture Co. v. Department of Revenue*, 109 Ill. 2d 202, 209 (1985); see *Freeman v. Williamson*, 383 Ill. App. 3d 933, 939 (2008) ("A statute of repose differs from a statute of limitations in that it is substantive rather than procedural.").

¶ 104     But as made clear in *Sang Ken Kim*, 368 Ill. App. 3d at 654, the *sine qua non* of probable cause is a *substantive*, fact-based determination as to whether the accuser had an "honest and sound suspicion that the accused committed the offense charged." (Internal quotation marks omitted.) Plainly, the answer to the substantive question of whether the accuser believed the accused actually committed the offense charged has nothing to do with the timing in which the accusation is made. See *Joiner*, 82 Ill. 2d at 45 ("[O]ne who procures or agrees to a disposition of the charges against him in a manner which leaves the question of his innocence unresolved may not bring a malicious prosecution action based upon such charges.").

¶ 105     The weight of authority in other jurisdictions confirms that dismissals of claims based on the statute of limitations are not a "favorable termination" of the matter for purposes of malicious-prosecution claims. See, *e.g.*, *Palmer Development Corp. v. Gordon*, 1999 ME 22, ¶¶ 10, 11, 723 A.2d 881, 884 (holding, in context of analogous tort of "wrongful use of civil proceedings," that dismissal based on limitations grounds is not "favorable termination" because "[a] successful statute of limitations defense does not reflect on the merits of an action"); *Frey v. Stoneman*, 722 P.2d 274, 278 (Ariz. 1986) (*en banc*) ("When a termination or dismissal indicates in some fashion that the accused is innocent of wrongdoing it is a favorable termination" but "a dismissal pursuant to a statute of limitations is not a favorable termination."); *Lackner v. LaCroix*, 602 P.2d 393, 395 (Cal. 1979) (dismissals on limitations grounds are not "favorable termination[s]," as they do not "reflect on [the accused's] innocence of the alleged wrongful conduct"); *Miskew v. Hess*, 910 P.2d 223, 233 (Kan. Ct. App. 1996) ("accepted rule" is that "a statute of limitations termination is not a favorable termination for the purposes of a malicious prosecution action").

¶ 106     For many of the same reasons, Scheiwe cannot establish the third element of her claim— that State Farm lacked probable cause to sue her. State Farm's claim was based on the allegation that Scheiwe was at least an at-fault driver in a multicar accident that resulted in another vehicle striking the vehicle of a State Farm insured. State Farm had a credible basis

- 14 -

for filing that claim: a police report stating that Scheiwe drove her car into a stopped vehicle that, due to the force of the collision, then struck a vehicle driven by a State Farm insured. To be sure, she had an ironclad (if technical) defense—the running of the limitations period—but that does not change the fact that State Farm had a valid basis for pursing the claim on the merits.

¶ 107    The entry of summary judgment to State Farm on Scheiwe's claim of malicious prosecution was proper.

¶ 108                                                              V

¶ 109    That leaves the claims of civil conspiracy, counts on which the predecessor judge, Judge Garcia, entered summary judgment (an order that the new judge reinstated).

¶ 110    Summary judgment is proper if the pleadings, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2014). We construe these materials strictly against the movant and liberally in favor of the nonmovant. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. As summary judgment is a drastic disposition, the moving party's right must be "clear and free from doubt." *Id.*

¶ 111    The tort of civil conspiracy involves a combination of two or more persons for the purpose of accomplishing, by concerted action, either an unlawful purpose or a lawful purpose by unlawful means. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999); *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 23 (1998). A plaintiff must prove an agreement and a tortious act committed in furtherance of that agreement. *McClure*, 188 Ill. 2d at 133; *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62-64 (1994).

¶ 112    The tortious act alleged here, as noted, is the tort of abuse of process, which we already explained involves an act in the use of the legal process that is improper in the regular conduct of legal proceedings and that is committed for an illegal purpose, an act that may include a fraudulent or malicious manipulation of service of summons as alleged in the complaint here. *Goldman*, 339 Ill. App. 3d at 182-84; *Kumar*, 354 Ill. App. 3d at 165.

¶ 113    A theory of civil conspiracy has the effect of extending liability for a tortious act beyond the active tortfeasor to individuals who have not acted but have only "planned, assisted, or encouraged the act." *McClure*, 188 Ill. 2d at 133; see *Adcock*, 164 Ill. 2d at 62-63. To be clear, however, civil conspiracy is an intentional tort that requires proof that a defendant " 'knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner.' " *McClure*, 188 Ill. 2d at 133 (quoting *Adcock*, 164 Ill. 2d at 64). Thus, accidental or negligent participation in a common scheme, or mere knowledge of the tortious activity, does not amount to conspiracy. *Id.* at 133-34; *Adcock*, 164 Ill. 2d at 64; see *Tribune Co. v. Thompson*, 342 Ill. 503, 530 (1930).

¶ 114    A conspiracy is rarely susceptible to direct proof. *McClure*, 188 Ill. 2d at 134. It is usually proven by circumstantial evidence and commonsense inferences drawn from the evidence. *Id.*; *Adcock*, 164 Ill. 2d at 66.

¶ 115    State Farm moved for summary judgment in September 2014, four years into the lawsuit. State Farm argued that plaintiffs had "no factual basis" for their claim of a conspiracy between State Farm and O'Dea, and that two affidavits submitted by State Farm attested to the lack of

any agreement between State Farm and O'Dea to bring these subrogation suits for an improper purpose, to use improper service of process, or to obtain unwarranted default judgments.

¶ 116    Plaintiffs responded, in part, with a Rule 191(b) affidavit demanding a continuance for additional discovery (first filed improperly by counsel, then filed by two of the named plaintiffs who adopted counsel's affidavit). See Ill. S. Ct. R. 191(b) (eff. Jan. 4, 2013). Plaintiffs also filed a response to the motion for summary judgment that argued, in significant part, that the supporting affidavits were improper because the documents on which the affiants relied were not attached to the affidavits.

¶ 117    Plaintiffs repeat those arguments on appeal. They argue that summary judgment was premature in that additional discovery was necessary, and that the trial court should have stricken the affidavits for failure to attach the documents on which the affiants relied for their sworn testimony.

¶ 118    We begin by reviewing the affidavits that State Farms attached to their summary judgment motion. They included the affidavit of defendant O'Dea and the affidavit of a State Farm claim section manager, Peter McCann.

¶ 119                                                    1

¶ 120    We start with O'Dea's affidavit and focus on those aspects relevant to the civil conspiracy claims. O'Dea testified that when he received a "new potential subrogation engagement from State Farm," he would "conduct an investigation as to whether the filing of a subrogation complaint may be appropriate." If O'Dea's investigation "indicate[d] that a subrogation claim [was] warranted," then he or someone at his law firm would prepare a draft complaint and forward it to State Farm "to secure an appropriate executed verification of the complaint."

¶ 121    O'Dea swore that he "had no agreement with State Farm to bring these subrogation lawsuits for any purpose other than to recoup the damages Plaintiffs owed State Farm and its insureds from the accidents involving Plaintiffs and State Farm insureds." He swore that he "had no agreement whereby State Farm would accept flawed service of process upon subrogation defendants or whereby [he] would collect unincurred costs from Plaintiffs."

¶ 122    O'Dea's affidavit then delved into the details of each of the four subrogation claims filed against the four named plaintiffs. As to each one, he denied that State Farm was ever notified of motions to quash service or vacate default judgments or that State Farm was made aware of any alleged irregularities in service of process. Specifically, he swore as to each of the four plaintiffs' cases that:

        (1) "Neither my firm nor I informed State Farm of the Motions to Quash Summons or the Motion to Vacate Default Selby filed or of any alleged flaws in service of summons on Selby";

        (2) "Neither my firm nor I informed State Farm of the Motion to Quash Summons Young filed or any alleged flaws in service of summons on Young";

        (3) "State Farm *** was not informed of the Motion to Quash or any alleged flaws in summons served upon Lopez;" and

        (4) "Neither my office nor I informed State Farm of any alleged flaws in service of summons in the lawsuit against Scheiwe" and "[n]either my office nor I notified State Farm that the subrogation complaint against Scheiwe was filed more than five years after the accident or after the expiration of the statute of limitations."

¶ 123    State Farm did not attach documents to the O'Dea affidavit reflecting communications with State Farm on the topics of these four subrogation lawsuits.

¶ 124                                                        2

¶ 125    Next, State Farm submitted the affidavit of McCann, who testified by affidavit that he worked at State Farm as a "Claim Section Manager." From January 2009 to November 2013, McCann was responsible for supervision of (1) a team that managed State Farm's portfolio of automobile subrogation claims; (2) a team that conducted "operational reviews" of the attorneys State Farm retained to prosecute its subrogation claims; and (3) State Farm's vendor management team, which oversaw the retainer agreements between State Farm and the attorneys, including O'Dea, that State Farm hired to prosecute subrogation claims.

¶ 126    McCann testified that, in the normal course of business, State Farm generates "Claim File Materials" for its subrogation cases, and that it created claim file materials for the cases it filed against Selby, Young, Lopez, and Scheiwe. McCann explained that each claim file material contains a "Claim Activity Log" on which State Farm's claims representatives and supervisors electronically record "significant information or memorialize therein pertinent conversations or events." McCann testified that entries on the claim activity log are made "in the ordinary course and scope of the business of State Farm."

¶ 127    McCann reviewed the claim file materials for the Selby, Young, Lopez, and Scheiwe subrogation cases. His testimony, based on that review, consisted of several points.

¶ 128    First, McCann echoed O'Dea's testimony, swearing that

> "State Farm had no agreement with Mr. O'Dea to file subrogation lawsuits against the Plaintiffs for any ulterior purposes; rather the sole purpose was to recover damages to which State Farm believed its insureds and it were entitled. State Farm had no agreement with Mr. O'Dea to use flawed process service with those subrogation defendants [that is, plaintiffs here] or to collect unincurred costs. State Farm certainly has not entered into any conspiracy or agreement with O'Dea to conspire against the four [plaintiffs here] in order to abuse process or for any other improper purpose."

¶ 129    As to State Farm's subrogation case against Selby, McCann swore that "State Farm was not notified of Selby's motion to quash summons or motion to vacate default," as "[n]o such pleadings are a part of the Claim File Materials" and "[n]othing is contained on the Claim Activity Log reflecting that such information was relayed to State Farm," and that "State Farm did not have any knowledge of any flaws in service of process in the lawsuit against Selby," as the "Claim File Materials make no reference to any defects in the lawsuit against Selby," and "[n]othing in [*sic*] contained on the Claim Activity Log reflecting that such information was relayed to State Farm."

¶ 130    McCann then repeated the same sworn testimony regarding the other three plaintiffs' cases, claiming that State Farm had no knowledge of motions attacking service of process or any irregularities in service of process, in each instance citing the lack of any reference to such issues in the claim file materials or the claim activity log.

¶ 131    Notably, neither the claim file materials nor the claim activity logs for plaintiffs' cases were attached to McCann's affidavit.

¶ 132                                                    B

¶ 133    Plaintiffs' principal argument on appeal is that these affidavits should have been stricken, and summary judgment thus denied, because State Farm did not attach to the affidavits the documents on which the affiants relied.

¶ 134    Affidavits used to support a motion for summary judgment are governed by Illinois Supreme Court Rule 191 (eff. Jan. 4, 2013). See *US Bank, National Ass'n v. Avdic*, 2014 IL App (1st) 121759, ¶ 21. Rule 191(a) requires that affidavits, among other things, "shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim *** is based"; and "*shall have attached thereto sworn or certified copies of all documents upon which the affiant relies ***.*" (Emphasis added.) Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013).

¶ 135    Because affidavits serve as a substitute for testimony at trial, "it is necessary that there be strict compliance with Rule 191(a)." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335-36 (2002). This requirement applies equally to the particularity requirement and the attached-papers provision; Rule 191(a)'s "plain language clearly requires that such papers be attached to the affidavit." *Id.* at 339.

¶ 136    The requirement that documents be attached is not a mere "technicality" and, if not adhered to, is fatal. *Id.* ("Rule 191(a) provisions barring conclusionary assertions and requiring an affidavit to state facts with 'particularity' would have little meaning were we to construe the attached-papers provision as merely a technical requirement that could be disregarded so long as the affiant were competent to testify at trial."); see also *PennyMac Corp. v. Colley*, 2015 IL App (3d) 140964, ¶ 16 ("The failure to attach supporting documents is fatal to the submission of the affidavit as substantive evidence."); *Preze v. Borden Chemical, Inc.*, 336 Ill. App. 3d 52, 57 (2002) ("The failure to attach the documents is fatal.").

¶ 137    The McCann affidavit violated this bright-line rule. For his testimony that State Farm had no knowledge of any irregularities, alleged or otherwise, in service of process on these subrogation cases, McCann explicitly stated that he relied on the claim file materials and claim activity logs. The law required State Farm to thus attach those documents to the affidavit. His affidavit is fatally flawed as a result.

¶ 138    We understand that redacted copies of some of this information were produced to plaintiffs in discovery. But that fact is "utterly irrelevant" to the question of compliance with Rule 191. *Lucasey v. Plattner*, 2015 IL App (4th) 140512, ¶¶ 21, 23 ("Given the strict-compliance requirement of *Robidoux*," affidavit was properly stricken for failure to attach relevant documents; it was "utterly irrelevant" that "the various documents [the affiant] failed to attach to his affidavit may be found elsewhere in this record."). The rule is "rigid"; there is no such thing as "substantial compliance" with Rule 191(a), excusing the failure to attach documents simply if the documents were otherwise available to or in the possession of the opposing party. *Doe v. Coe*, 2017 IL App (2d) 160875, ¶¶ 16, 18.

¶ 139    And that is to say nothing of the fact that the portions of the produced files that were redacted appear to be the very parts on which McCann relied for his testimony about communications (or lack thereof) between State Farm and O'Dea. So even if State Farm could avoid the attached-documents requirement in Rule 191(a) by claiming the documents were otherwise produced in discovery—and it cannot—we would reject that argument for the additional reason that the full, unredacted copies were *never* produced in discovery.

¶ 140 Having said that, we will credit McCann's affidavit this much: in discussing what State Farm did or did not know about issues concerning service of process in these four subrogation cases, he limited his testimony to matters within his personal knowledge, as required by Rule 191(a). See Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013) (affidavits "shall be made on the personal knowledge of the affiants"). He did not claim to have independent memory or knowledge of the State Farm/O'Dea communications on these four cases; he specifically testified that he reviewed the claim file materials and claim activity logs, and that those documents reflected no communications about controversies involving service of process. His personal knowledge was admittedly limited to what those documents told him. (And then, of course, the affidavit laid a foundation for the admission of those documents as business records, avoiding hearsay problems.) Thus, though the McCann affidavit violated the attached-documents provision of Rule 191(a) and should have been stricken, at least it satisfied the personal-knowledge requirement.

¶ 141 We make that last point by way of contrast with the O'Dea affidavit. There are two things to understand about O'Dea's affidavit that, together, demonstrate the fatal problems with the affidavit. First, in the portions of his affidavit in which he stated that State Farm was never apprised of problems with service of process on these four subrogation cases, O'Dea said that "neither my law firm nor I" so notified State Farm. And second, while he cited and attached documents in every other step of his affidavit while going through a blow-by-blow account of how each of the four subrogation cases unfolded (for a grand total of 53 documentary exhibits), when it came time to discuss his communications with State Farm, he conspicuously cited no documents and attached no documents.

¶ 142 That is a problem for two reasons. First, by stating that "neither my law firm nor I" notified State Farm of any controversy surrounding service of process on these four subrogation cases, O'Dea was not merely speaking for himself—he was speaking for everyone who worked at his law firm. So even if we were inclined to accept that O'Dea possessed near superhuman recall, such that he could remember every communication made on four cases out of thousands he handled for State Farm, from several years ago, based purely on his own memory and knowledge (and suffice it to say we find that nearly impossible to believe), O'Dea most certainly did not have personal knowledge of what his other lawyers or staff may have said to State Farm, or State Farm to them—at least not without relying on external information.

¶ 143 That external information, at least conceivably, could come from conversations O'Dea had with his other lawyers or with individuals at State Farm. But in an affidavit based only on his personal knowledge, he would have to state explicitly that he spoke with those other people and detailed what they told him. A hearsay objection probably would not be far behind, and we are not suggesting that such affidavit testimony would be admissible—but at least O'Dea would be speaking from personal knowledge.

¶ 144 Or, far more likely, O'Dea—like McCann—would have known what the lawyers in his firm said to State Farm, or State Farm to them, based on documents in those four case files. But just as McCann's affidavit properly did, O'Dea would have had to reference those documents. The only thing he would then be able to say from personal knowledge (like McCann) was that he reviewed those documents and they revealed no communications on the subject of service of process. (And again, he would have to lay foundation for those documents.)

¶ 145     The long and short is this: the personal-knowledge requirement of Rule 191(a) is satisfied if " 'it appears that the affidavit is based upon the personal knowledge of the affiant and there is a reasonable inference that the affiant could competently testify to its contents at trial.' " *Zamora v. Lewis*, 2019 IL App (1st) 181642, ¶ 67 (quoting *Kugler v. Southmark Realty Partners III*, 309 Ill. App. 3d 790, 795 (1999)). If the Rule 191(a) testimony is, instead, based on inadmissible hearsay, the affiant could *not* competently testify to those facts at trial, and Rule 191(a) is not satisfied. *Id.*; see also *Rico Industries, Inc. v. TLC Group, Inc.*, 2018 IL App (1st) 172279, ¶ 49.

¶ 146     Here, it is patently obvious that O'Dea's testimony about his communications with State Farm, concerning problems or issues with service of process on those four claims, was *not* based on personal knowledge. We are not even willing to accept that his testimony about his *own* communications with State Farm were based on personal knowledge—not when he relied on documents from those case files to describe every other thing that transpired on those cases, and not when we would be required to believe that O'Dea had perfect recall of four cases out of thousands he has filed for State Farm, the four of which were several years ago. In a *de novo* review of a summary-judgment ruling that must be "clear and free from doubt" (*Mashal*, 2012 IL 112341, ¶ 49), we have considerable doubt on that critical point.

¶ 147     And that is to say nothing of O'Dea's testimony concerning communications between State Farm and other lawyers and staff at O'Dea's firm. That information, by definition, is not something within O'Dea's personal knowledge. It seems rather obvious that, just as he relied on documents from the case files 53 other times in his affidavit, O'Dea was relying on documents from the case files when he testified about communications (or lack thereof) with State Farm regarding service of process. But he cannot speak to that information without referencing the source (documentary or otherwise) of that information. See *Zamora*, 2019 IL App (1st) 181642, ¶ 67; *Rico*, 2018 IL App (1st) 172279, ¶ 49. And of course, if that source was documentary, as we suspect, O'Dea was required to attach those documents to his affidavit, "so that the trial court could review the bases for [the affiant's] assertions." *Doe*, 2017 IL App (2d) 160875, ¶ 11.

¶ 148     These two requirements work hand-in-glove. The personal-knowledge requirement forces affiants only to testify about facts within their personal knowledge, and if that knowledge was gleaned from an external source (oral, written, whatever), the affiant must say so. And if that source is written, that written document must be attached. The combination of those requirements is intended to stop precisely what happened in this case—an affiant, O'Dea, stating as "fact" something that he could not possibly know within his own independent knowledge but not referencing any documents in an attempt to avoid the attached-documents requirement. If that tactic were permitted, affiants could rely on documents, adopt the knowledge gleaned from those documents as their own personal knowledge, but not mention their reliance on that document and thereby avoid the attached-document requirement altogether. The attached-document requirement of Rule 191(a) would go from being an absolute, bright-line requirement to a dead letter.

¶ 149     As a purely technical matter, because O'Dea did not expressly reference file documents that were unattached, we cannot find a violation of the attached-document requirement of Rule 191(a). We base our rejection of that affidavit, instead, on a violation of the personal-knowledge requirement. But we admonish O'Dea and State Farm that if another summary

judgment motion is coming down the pike in the future, with similar affidavits, the affiants must comply strictly and fully with each of these requirements of Rule 191(a).

¶ 150    For these reasons, the O'Dea affidavit cannot provide a basis for summary judgment in this matter.

¶ 151                                                          C

¶ 152    In its briefs on appeal, State Farm was conspicuously silent about its failure to attach documents to the McCann affidavit despite McCann referencing them. We asked State Farm at oral argument why it was appropriate for State Farm to file these affidavits without attaching the relevant documents concerning State Farm/O'Dea communications. We were surprised by State Farm's answer: State Farm said it was not required to attach those documents because they were privileged attorney-client communications.

¶ 153    That was the first time anyone had heard that position, at least insofar as the motion for summary judgment and the two affidavits were concerned (generally speaking, of course, State Farm has been invoking the privilege throughout this lawsuit). To be fair to State Farm, the trial court never pressed State Farm to explain why it could reference documents in a summary-judgment affidavit without attaching the documents. Plaintiffs, for their part, all but sang their attached-documents objection from the mountaintop before Judge Garcia. Counsel for plaintiffs asked for those documents in a purported Rule 191(b) affidavit; two individual plaintiffs then filed Rule 191(b) affidavits of their own, adopting counsel's affidavit; plaintiffs extensively objected to the affidavits for failure to attach the relevant documents in their response to the motion for summary judgment; and at oral argument on summary judgment, counsel repeatedly insisted that the affidavits were improper because the referenced documents were not attached.

¶ 154    Judge Garcia was not impressed. At one point during oral argument, in response to one of the many times counsel for plaintiff objected, Judge Garcia asked, "What documents do you believe they're in possession of that they should have attached?" Plaintiffs' counsel quite reasonably responded that she wanted the very documents that McCann had claimed he reviewed, per the attached-document requirement of Rule 191.

¶ 155    Later, Judge Garcia said, "What kinds of documents are you looking for? It sounds like you're trying to have them demonstrate a negative; that the absence of conspiracy is somehow set out in some document somewhere." Again, counsel for plaintiffs reminded the court of the attached-documents requirement of Rule 191, apparently to no avail.

¶ 156    The court committed error. And because of that error, State Farm was never required to explain in the trial court its justification for failing to attach documents (at least those concerning State Farm/O'Dea communications) to the two affidavits supporting the motion for summary judgment.

¶ 157    But now we have State Farm's answer for the first time on appeal. State Farm says the documents on which McCann relied were privileged and thus not subject to disclosure, Rule 191(a) notwithstanding.

¶ 158    This argument, obviously, had never been briefed. We considered otherwise disposing of this case and remanding the cause to the trial court to first consider this question of law. But we choose not to do so, primarily in the interest of judicial economy. This case is nearly 10 years old, delayed in large part on motion practice, arguments over class certification, and one

previous, complex appeal. And the portion of the case against O'Dea remains pending in the trial court. This case is now in the appellate court for the second time, after the first appeal was dominated by a privilege question that was a case of first impression under Illinois law. If we do not resolve this question now, there is a significant risk that this new privilege question will dominate the trial court's consideration of the remainder of the case—and unless this case settles, we have little doubt the question will be back before us on appeal number three.

¶ 159    Seeing no reason to delay the obvious, particularly when we are dealing with a pure question of law that would be subject to *de novo* review, we thus asked the parties to brief the question. We framed the question rather generally:

> "May State Farm rely on privileged attorney-client communications in support of its motion for summary judgment and then refuse to disclose those communications (a) to plaintiffs and (b) to the trial court?"

¶ 160    We noted in our supplemental briefing order that this discussion could include both an analysis of Rule 191(a)'s requirements as well as the question of whether State Farm waived the attorney-client privilege to the extent that it relied on attorney-client communications in support of its motion for summary judgment. The parties have briefed both of those topics. And we now find, based on both Rule 191(a) and the doctrine of waiver of privilege, that State Farm may not avoid the attached-documents requirement of Rule 191.

¶ 161                                    1

¶ 162    Does the attorney-client privilege permit State Farm to avoid the attached-documents requirement of Rule 191(a)? The answer, in our view, is a clear no.

¶ 163    We start with the basics, a reminder that an affidavit is a substitute for live, in-court testimony. *Zamora*, 2019 IL App (1st) 181642, ¶ 67; *Rico*, 2018 IL App (1st) 172279, ¶ 49. So let us consider for a moment how things would operate in a court hearing. Putting aside expert testimony, which is not germane here, a lay witness may only testify in court to facts on which that lay witness has personal knowledge. See Ill. R. Evid. 602 (eff. Jan. 1, 2011) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). So as long as lay witnesses can establish the foundation for their personal knowledge ("I was standing at the intersection at the time in question and was looking at the traffic light"), they can testify to the fact of which they have personal knowledge ("the light was red when the SUV entered the intersection").

¶ 164    But if the information in question comes not from the witness's personal knowledge but rather from a document, it is the *document* that supplies the fact, the proof. The witness may testify but only insofar as foundation is required to authenticate the document and admit it into evidence—say, for example, to admit the document as a business record. See, *e.g.*, Ill. R. Evid. 803(6) (eff. Apr. 26, 2012). And yes, in certain instances at trial, the witness may read from the document or even give his or her take on the document, but it is still the document supplying the proof, not the witness. The bottom line is that, if that document is going to be used as proof of a fact in a case, that document, quite obviously, will have to be first introduced into evidence. See *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 21 (document must be admitted into evidence before court may consider its contents); *People v. One 1999 Lexus, VIN JT8BH68X2X0018305*, 367 Ill. App. 3d 687, 689-90 (2006) (same).

¶ 165    If we analogized the McCann affidavit, filed without the attached documents, to McCann supplying in-court testimony without the documents, it would look like this: State Farm calls McCann to the witness stand; McCann testifies that he reviewed the claim file materials and claim activity logs, and a review of them revealed no evidence of communications between State Farm and counsel; but State Farm announces that it will not admit any of these documents into evidence, and neither the court nor opposing counsel would be allowed to so much as glance at them. It would be the equivalent of State Farm saying, "our witness says these documents support our position, but nobody gets to see them; you have to take our word for it and rule in our favor."

¶ 166    Needless to say, that would not get State Farm very far. Mr. McCann's testimony would likely be stricken as relying on inadmissible hearsay—if he was even allowed to testify to the contents of the documents at all without first introducing them into evidence—and ultimately, there would be no admissible evidence whatsoever as to what those documents did or did not say.

¶ 167    Would it make a difference *why* State Farm did not introduce those documents into evidence—reliance on a privilege or some other reason? No. The point is the documents, not McCann on his own, contain the critical information, so without those documents admitted into evidence, there is no evidence for the court to consider. State Farm could fail to admit those documents into evidence as an accidental oversight, as a deliberate invocation of privilege, or for any other reason. It would make no difference. The only thing that matters is that State Farm would have no admissible evidence to support its position absent the admission into evidence of those documents.

¶ 168    And thus the same result at the summary judgment stage, using an affidavit as a substitute for in-court testimony: without attaching the documents that supply the facts that State Farm wishes to prove, State Farm has no proof. It has nothing more than McCann's take on what he read in those documents, without the court (or plaintiffs' counsel) having any chance to review the accuracy of those claims. The invocation of the attorney-client privilege provides no relief from the attached-documents requirement of Rule 191(a).

¶ 169                                              2

¶ 170    There is a second and independent reason why State Farm could not submit an affidavit in support of summary judgment that relied on privileged communications and then, in the next breath, deny both the court and plaintiffs access to that information. Rule 191(a) aside, State Farm's actions amounted to a waiver of its attorney-client privilege.

¶ 171    As an initial matter, plaintiffs do not dispute that the communications between State Farm and O'Dea concerning the litigation of the four subrogation cases relevant here were privileged attorney-client communications. Attorney and client were communicating about those cases before and while they were pending. State Farm has insisted throughout this lawsuit that those conversations were protected by the privilege, and plaintiffs have never disputed that fact. They have argued at various times that the privilege was waived, but they have never challenged the underlying premise that the privilege attached to those State Farm/O'Dea communications. We have no basis to dispute that point, either.

¶ 172    "Where legal advice of any kind is sought from a lawyer in his or her capacity as a lawyer, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by the client or lawyer, unless the protection is waived." *Center Partners, Ltd.*

*v. Growth Head GP, LLC*, 2012 IL 113107, ¶ 30. We are concerned here with that final caveat—whether the protection was waived by State Farm's use of the McCann affidavit in support of its motion for summary judgment.

¶ 173                                                                                    a

¶ 174        As the holder of the attorney-client privilege, only the client may waive it. *Id.* ¶ 35. Waiver is the voluntary relinquishment of a known right that arises "from an affirmative, consensual act." *Id.* ¶ 66. "Any disclosure by the client [of privileged communications] is inherently inconsistent with the policy behind the privilege of facilitating a confidential attorney-client relationship ***." (Internal quotation marks omitted.) *Id.* ¶ 35.

¶ 175        There is no precise formula or clearly defined set of parameters spelling out when a waiver occurs; the determination must be made on a case-by-case basis. *Id.* ¶ 66. Broadly speaking, our supreme court has identified two situations in which waiver occurs.

¶ 176        The first is "when the client voluntarily testifies to the privileged matter." *Id.* ¶ 35. Our supreme court deems that voluntary disclosure to be an "express waiver." *Id.* ¶ 66 ("A clear example of an express waiver is when a client voluntarily testifies about privileged communications.").

¶ 177        This example of waiver is rather obvious and self-explanatory. If a party voluntarily testifies about its privileged communications with counsel, that party waives the right to then claim that the communications remain confidential. See, *e.g.*, *Profit Management Development, Inc. v. Jacobson, Brandvik & Anderson, Ltd.*, 309 Ill. App. 3d 289, 300 (1999) (party waived attorney-client privilege by giving deposition testimony that referred to his attorney's advice about legal effect of state-court judgment); *Turner v. Black*, 19 Ill. 2d 296, 309 (1960) (client's testimony at trial that he did *not* instruct attorney to prepare certain estate documents, and that attorney did *not* explain contents of documents to him, constituted waiver of attorney-client privilege and "opened the way for [attorney] to testify concerning such matters"); *Newton v. Meissner*, 76 Ill. App. 3d 479, 498 (1979) (plaintiff's testimony that she did not inform her lawyer of her lack of independent memory of car accident until after she was deposed constituted waiver of privilege that "opened the way" for her counsel to testify on the subject).

¶ 178        The second instance of waiver identified by the supreme court occurs "when the client voluntarily injects into the case either a factual or legal issue, the truthful resolution of which requires examination of confidential communications." *Center Partners*, 2012 IL 113107, ¶ 35. That is deemed an implied or "at-issue" waiver. See *Lama v. Preskill*, 353 Ill. App. 3d 300, 305 (2004); *Shapo v. Tires 'N Tracks, Inc.*, 336 Ill. App. 3d 387, 394 (2002); *Adler v. Greenfield*, 2013 IL App (1st) 121066, ¶ 65.

¶ 179        The logic here, too, is relatively straightforward: if the litigant injects an issue into the case that relies on privileged attorney-client communications, fundamental fairness requires that the opposing party be allowed to examine those otherwise privileged communications. See *Center Partners*, 2012 IL 113107, ¶ 39 (implied-waiver doctrine " 'ensures fairness' " by preventing litigant from injecting communications into case but then preventing opposing party from examining such communications (quoting *In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 24 (1st Cir. 2003))); *Patrick v. City of Chicago*, 154 F. Supp. 3d 705, 711 (N.D. Ill. 2015) ("The implied waiver doctrine ultimately is based on

considerations of fairness: that is, a party may not use privilege as a tool for manipulation of the truth-seeking process.").

¶ 180 For example, implied waiver "prevent[s] a party from strategically and selectively disclosing partial attorney-client communications with his attorney to use as a sword, and then invoking the privilege as a shield to other communications so as to gain a tactical advantage in litigation." (Emphasis omitted.) *Center Partners*, 2012 IL 113107, ¶ 57. As our supreme court elaborated:

"When a partial disclosure is made in the litigation context, the apparent prejudice that could result to the opposing party is obvious: a party has injected into the litigation communications with his attorney which may aid in the party's prosecution or defense of a claim, yet the party can also frustrate the truth-seeking process by claiming privilege when the opposition seeks to discover the full context of the confidential communications." *Id.*

¶ 181 Simply put, "litigants cannot hide behind the privilege if they are relying upon privileged communications to make their case." *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005); see also *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989) (at-issue exception applies when, through some "affirmative act," the owner of the privilege "place[s] information protected by [the privilege] in issue" (internal quotation marks omitted)); 2 Edward J. Imwinkelried, The New Wigmore: A Treatise on Evidence § 6.12.4, at 877 (2002) ("It is deemed unfair for the client to at once inject the issue of the content of [privileged] communication while asserting the right to suppress the most reliable evidence about that issue.").

¶ 182 "Thus, if defendants have introduced into the litigation privileged communications to be used as a sword for tactical advantage, those communications, and undisclosed communications of the same subject matter, are discoverable." *Center Partners*, 2012 IL 113107, ¶ 65. And for good reason: "[w]ere the law otherwise," a party wielding the privilege "could selectively disclose fragments helpful to its cause, entomb other (unhelpful) fragments," and by so doing, "kidnap the truth-seeking process." *In re Keeper of the Records*, 348 F.3d at 24.

¶ 183 b

¶ 184 We find that waiver occurred here on both grounds discussed above. First, State Farm expressly waived its attorney-client privilege when McCann, by affidavit, "voluntarily testifie[d] to the privileged matter." *Center Partners*, 2012 IL 113107, ¶ 35. That is, McCann described the content of State Farm's communications with its attorney, O'Dea, regarding the four underlying subrogation lawsuits.

¶ 185 It is fair to note, as State Farm does, that McCann did not testify as to what O'Dea did tell State Farm but what he did *not* tell them—he never notified State Farm of any actual or alleged problems with service of process on those four subrogation cases. But we find that distinction to be immaterial. What matters is that McCann described the conversations, if only by what they did not contain. It would be an abuse of the privilege to allow a litigant to secretly peruse its privileged communications, sprinkle out select examples of things that were *not* said, but then disallow any substantive follow-up through a claim of privilege.

¶ 186 A good example comes from our supreme court's decision in *Turner*, a case that has been cited often by our supreme and appellate courts as an example of a voluntary disclosure of

privileged communications and thus an express waiver. See *Novak v. Rathnam*, 106 Ill. 2d 478, 484 (1985); *Owen v. Mann*, 105 Ill. 2d 525, 535 (1985); *People v. Phillips*, 128 Ill. App. 3d 457, 459 (1984); *Newton*, 76 Ill. App. 3d at 498; *People v. O'Connor*, 37 Ill. App. 3d 310, 314 (1976).

¶ 187    In *Turner*, 19 Ill. 2d at 298-99, Montague Turner (and after his death, his wife) sought to void certain inheritance documents drafted by his former attorney and trustee, Benjamin Black. At trial, Turner testified, in the supreme court's words, that "he had not instructed Black to prepare" either the prenuptial agreement, the deed in trust, the trust agreement, or the will. *Id.* at 309. Rather, Turner testified that, on the date of October 30, 1954, he arrived at Black's office only to find that the will and prenuptial agreements had already been drafted, and though "Black did not explain the provisions" of those agreements, Turner signed them regardless. *Id.* at 301-02. Turner likewise testified that when he signed the deed in trust and trust agreement in Black's office in February 1955, he "did not ask that these papers be prepared," he did not read them, and "their provisions were not explained or read to him." *Id.*

¶ 188    Black, the attorney, then testified that Turner had telephoned him, and Black told him that he had prepared the prenuptial and will documents, and they were ready for his signature on October 30, 1954. *Id.* at 309. Black further testified that, in February 1955, Turner "instructed Black to prepare the irrevocable trust agreement." *Id.* As the supreme court noted, Black's testimony "was entirely contradictory of Turner's earlier testimony that he had not instructed Black to prepare the various instruments." *Id.*

¶ 189    On appeal, Turner's wife argued that the trial court erred by allowing the attorney, Black, to testify to privileged communications, but the supreme court found no error: "By voluntarily testifying as he did, Turner waived the attorney-client privilege and opened the way for Black to testify concerning such matters." *Id.* That is, though the opinion only revealed that Turner testified as to what he did *not* say to Black and what Black did *not* say to him, the supreme court nevertheless found waiver because Turner was describing his privileged communications with his attorney, if only by what was not said.

¶ 190    So too here. McCann was unequivocally testifying about the content of State Farm's communications with O'Dea, if only by testifying as to what O'Dea did not tell State Farm. That, in our view, can only be considered a voluntary disclosure of the privileged communication.

¶ 191    And even if no express waiver occurred here, there can be no question that an implied waiver occurred. Through McCann's review of the privileged communications and his testimony as to what was *not* found therein, State Farm was obviously attempting to seek tactical advantage, by way of summary judgment, based on the content of privileged communications.

¶ 192    That tactic was incredibly unfair to plaintiffs, who were helpless to defend against the factual claims made by McCann. Plaintiffs insisted, repeatedly, that they were entitled to the documents (not based on a privilege waiver; that issue never came up below, as we mentioned), but their request fell on deaf ears. As a result, State Farm was permitted to comment substantively on the content of its attorney-client communications without plaintiffs having any ability to challenge those assertions. It is hard to imagine a more blatant example of using the communications as a "sword" while invoking the privilege as a "shield."

¶ 193    Though it is difficult to find a decision with facts precisely like ours (nor has either party cited one), we find instructive the federal court decision of *In re Human Tissue Products*

*Liability Litigation*, 255 F.R.D. 151 (D.N.J. 2008). The plaintiffs sued a biomedical services company (BTS) and several entities with which it did business, including RTI, alleging a scheme to illegally harvest tissue from human corpses. *Id.* at 154. RTI moved for summary judgment, claiming a good-faith immunity defense—essentially, that it did not know or have reason to know that BTI was breaking the law. *Id.* at 155.

¶ 194    The district court allowed the plaintiffs to take discovery on that question. One of RTI's officers, Roger Rose, testified at his deposition that RTI hired a law firm to conduct a background check on the principal of BTS, a man named Mastromarino, given his reputed ties to organized crime. Rose testified that his lawyer gave him the results of that background check "over the phone" and that, "other than learning about Mastromarino's drug problems, there was no additional 'negative information' that he learned as a result of the background investigation." *Id.* at 160.

¶ 195    The plaintiffs argued that they should be allowed to see the underlying documents, the background check, that RTI's lawyers discussed or described to RTI over the phone. The magistrate ruled that RTI impliedly waived the attorney-client privilege and ordered the documents to be disclosed:

> "Having chosen to go beyond mere denial of Plaintiffs' claims, Defendant cannot on the one hand implicitly rely on the fruits of this background investigation as evidence that RTI exercised its diligence and thus had no reasonable basis of knowing that the consent forms submitted by Mastromarino were fabricated, while at the same time depriving Plaintiffs of access to this information on the basis of privilege. To do so prevents Plaintiffs from effectively challenging RTI's good faith intentions in choosing to continue their business relationship with Mastromarino during the relevant time period, and therefore undercuts the fairness considerations underlying the attorney-client privilege doctrine." *Id.* at 161.

¶ 196    State Farm's conduct in this case is analogous to what RTI did in *Human Tissue*. In each case, the client moved for summary judgment based on its lack of knowledge of wrongdoing. In each case, the basis for lack of knowledge was gleaned from an attorney-client communication. And in each case, the client described the contents of that communication in general terms—in *Human Tissue*, that "no additional 'negative information' " (*id.* at 160) was related by lawyer to client; here, that nothing in the claim file materials or claim activity logs showed that O'Dea ever told State Farm about alleged or actual irregularities in service of process in the underlying subrogation cases. Each case involved the voluntary, affirmative act of seeking summary judgment and using favorable references to attorney-client communications to do so, without providing the opposing party the opportunity to see the documents underlying those privileged communications.

¶ 197    State Farm impliedly waived the attorney-client privilege by affirmatively relying on the content of the privileged communications contained in those case files to obtain summary judgment. Plaintiffs were entitled to challenge McCann's factual assertions by reviewing those documents themselves.

¶ 198                                                       c

¶ 199    State Farm raises many arguments against a finding of waiver. We cannot agree with any of them.

¶ 200    First, State Farm argues that implied waivers are limited to the assertion of claims or defenses on which the litigant bears the burden of proof. Here, in contrast, when State Farm moved for summary judgment, it raised no affirmative defense or counterclaim on which it had the burden of proof.

¶ 201    To be sure, implied waivers are often found in the context of a formal claim or defense. For example, if a client sues its lawyer for legal malpractice, the client puts at issue the content of the lawyer's advice and thus impliedly waives the attorney-client privilege. See, *e.g.*, *Fischel & Kahn, Ltd. v. van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 585 (2000); *Shapo*, 336 Ill. App. 3d at 394. Criminal defendants who raise a claim of ineffective assistance of counsel implicitly waive the privilege, at least insofar as their lawyer's advice was allegedly deficient. See, *e.g.*, *United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009) (collecting cases). A litigant might raise an advice-of-counsel defense, which generally waives any claim that its communications with that attorney are privileged. See, *e.g.*, *Novak v. State Parkway Condominium Ass'n*, No. 13-cv-8861, 2017 WL 1086767, at *6 (N.D. Ill. Mar. 20, 2017).

¶ 202    But we are aware of no decision that places some robotic limitation on the implied-waiver doctrine, and we can think of no good reason why one should exist. We have noted above, at length, that the doctrine is based first and foremost on fairness. See *Center Partners*, 2012 IL 113107, ¶ 39. Our supreme court has spoken on this topic in broad terms and has never suggested that waiver should be limited exclusively to the context of a formal claim or affirmative defense. See, *e.g.*, *id.* ¶¶ 35, 65 (waiver occurs "when the client voluntarily injects into the case either a factual or legal issue" whose resolution requires invasion of privileged communications; waiver occurs "if defendants have introduced into the litigation privileged communications to be used as a sword for tactical advantage").

¶ 203    Here, the McCann affidavit was filed as part of State Farm's motion for summary judgment. It might not be a "claim" or affirmative defense *per se*, but it is most certainly an " 'affirmative act' " (*Conkling*, 883 F.2d at 434) in which State Farm sought to use its attorney-client communications as a "sword" for its "tactical advantage" (*Center Partners*, 2012 IL 113107, ¶ 65), while at the same time trying to "hide behind the privilege" (*Lott*, 424 F.3d at 454) to prevent the opposing party from determining the truth of its assertions. State Farm certainly "injected" into the litigation a "factual issue" (see *Center Partners*, 2012 IL 113107, ¶ 35), namely that O'Dea never told State Farm about problems, actual or alleged, with service of process on these four subrogation lawsuits.

¶ 204    And State Farm unquestionably bears the burden of proof on summary judgment. See *Haslett v. United Skates of America, Inc.*, 2019 IL App (1st) 181337, ¶ 38 (party moving for summary judgments "bears the initial burden of proof"). Even if the burden of production later shifts, the movant "always has the burden of persuasion." *Triple R. Development, LLC v. Golfview Apartments I, L.P.*, 2012 IL App (4th) 100956, ¶ 12. So we reject State Farm's attempt to so narrowly limit the application of the implied-waiver doctrine. State Farm voluntarily filed a motion for summary judgment on which it carried the burden of persuasion, and it voluntarily relied on privileged communications to win that motion. We can think of no reason why the implied-waiver doctrine would not clearly and obviously apply here.

¶ 205    In a similar vein, State Farm argues that it did nothing more than refute plaintiffs' allegations, and the mere denial of allegations does not amount to a waiver. We agree that the mere denial of an opposing party's claim cannot constitute an implied waiver. See, *e.g.*, *Fischel & Kahn*, 189 Ill. 2d at 585-87; *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D.

316, 324 (N.D. Ill. 2008) (applying Illinois law). That principle is inviolate, for a litigant is required to answer the individual allegations of a complaint, counterclaim, or affirmative defense on pain of admitting the allegations if it does not. See 735 ILCS 5/2-610(b) (West 2018) (allegations in pleadings not explicitly denied are deemed admitted); *Pinnacle Corp. v. Village of Lake in the Hills*, 258 Ill. App. 3d 205, 209 (1994) (failure to deny well-pleaded facts results in such facts being deemed admitted). There is nothing "voluntary" about denying allegations of a complaint. Nor could anyone say that a litigant's mere denial of plaintiff's allegations of wrongdoing between client and attorney would be tantamount to using the privilege as a "sword." A shield, maybe, but not a sword.

¶ 206    So here, by filing an answer that denied that it conspired with O'Dea to commit abuse of process, and by denying that it had any knowledge of irregularities in service of process on the four subrogation lawsuits, State Farm did not, by any stretch, waive its attorney-client privilege.

¶ 207    But State Farm did far more here than merely file a pleading that denied plaintiffs' allegations. State Farm moved for summary judgment and attached to that motion an affidavit, sworn testimony, attempting to *prove* that it did not receive any notification from O'Dea about problems with service of process. Indeed, at various times during its supplemental briefing, State Farm claims that it merely denied the allegations and then attempted to "prove up" its denial. It is the proving-up part that constituted the waiver; if its method of "proving up" its denial is reliance on privileged communications, State Farm cannot then deny plaintiffs access to that proof.

¶ 208    Next, State Farm claims that a decision from the Colorado Supreme Court, *State Farm Fire & Casualty Co. v. Griggs*, 2018 CO 50, compels a finding of no waiver here. It does not. Suffice it to say, the lawyer's affidavit there, filed in response to a motion for sanctions, did not disclose, reference, or even hint at any communications with his client, State Farm; the affidavit merely recounted how the attorney discovered that the amount of the medical lien had been grossly overstated and what he did upon discovering that fact. See *id.* ¶ 7. Nor, for that matter, was State Farm claiming an advice-of-counsel defense or anything that remotely relied on privileged communications with the lawyer; it was merely responding to the motion for sanctions that claimed that State Farm intentionally concealed the proper lien amount. See *id.* ¶ 23 (noting that State Farm's response "does not depend on [its lawyer's] advice, and thus, State Farm is not attempting to use privileged communications as a 'sword' while simultaneously using the privilege as a shield"). Our case is far removed from *Griggs*.

¶ 209    We also reject State Farm's claim at oral argument that McCann did not "rely" on privileged communication, noting that McCann only said he "reviewed" them. That is not a credible distinction. We do not need McCann to actually use the word "rely" to understand that McCann substantively commented on the content of the privileged communications after having reviewed them. That is precisely what we mean by "relying" on the privileged communications—he read them and then relayed something about their contents in sworn testimony.

¶ 210    At oral argument, counsel suggested that a finding of waiver would have a chilling effect that would unfairly punish a party for invoking the attorney-client privilege. That is to say, if State Farm could not comment on the substantive content (or lack thereof) of the privileged communications, then it was left with the undesirable choice of either waiving the privilege or

maintaining it and thereby leaving it defenseless against the allegations of conspiracy raised by plaintiffs.

¶ 211    In a situation like this one, where the claim is that client and attorney conspired to commit a tortious act, it is true that the client faces the choice of substantively discussing the attorney-client communications, thereby waiving the privilege, versus asserting the privilege and remaining silent about the privileged communications. And that may be a difficult choice. But we have never suggested that the attorney-client privilege comes without consequences. The attorney-client privilege guarantees only one thing—that a client may keep its communications with counsel secret. It does not guarantee that invocation of the privilege will be painless.

¶ 212    No doubt, some of the consequences of invoking the privilege may be unfavorable. A client may forgo favorable evidence contained within its privileged communications by invoking the privilege. And maintaining the privilege throughout the litigation could make for awkard trial strategy. It might be hard to stay mum against an opposing party's claim that attorney and client colluded to commit some tortious act.

¶ 213    But it is not as if that never happens. It is not unheard-of for clients to face the option of invoking the privilege and forgoing some argument or defense, on the one hand, versus asserting the defense and waiving the privilege, on the other. See, *e.g.*, *Peterson v. Wallace Computer Services, Inc.*, 984 F. Supp. 821, 824, 826 (D. Vt. 1997) (defendant, with evidence to support defense of "adequate investigation" in hostile-workplace claim, had choice of asserting defense and waiving attorney-client privilege or not asserting defense, in which case attorney-client communications "would remain privileged" throughout litigation). And if they choose to invoke a privilege and keep the attorney-client communications confidential, they often seek a motion *in limine* preventing the jury from drawing an adverse inference against them for invoking the privilege. See, *e.g.*, *Regan v. Garfield Ridge Trust & Savings Bank*, 220 Ill. App. 3d 1078, 1091 (1991); *Broyles v. Cantor Fitzgerald & Co.*, No. 10-854-JJB-CBW, 2016 WL 7656028, at *1-2 (M.D. La. Sept. 8, 2016); *In re: General Motors LLC Ignition Switch Litigation*, 14-MD-2543 (JMF), 2015 WL 8130449, at *3 (S.D.N.Y. Dec. 3, 2015); *Beraha v. Baxter Healthcare Corp.*, No. 88 C 9898, 1994 WL 494654, at *3 (N.D. Ill. Sept. 6, 1994).

¶ 214    And the upshot, of course, is that by invoking the privilege in a case such as this one, the plaintiff's burden in making its case is all that more onerous. The opposing party will be left with the exceedingly difficult task of proving collusion between attorney and client without having access to any of the communications between attorney and client.

¶ 215    So while we agree that a client's decision is not necessarily an easy one in a case like this, the attorney-client privilege never guarantees a favorable outcome—and ultimately, for better or worse, the decision remains the client's to make, after balancing the pros and cons.

¶ 216    More importantly, whatever unfairness State Farm may claim utterly pales in comparison to the unfairness to plaintiffs if State Farm were allowed to do what it did here—affirmatively reference and describe the privileged communications as evidence in support of summary judgment, then turn around and deny plaintiffs access to that very evidence, leaving plaintiffs defenseless to challenge that proof.

¶ 217    Next, State Farm claims that "[p]laintiffs cannot show they were denied access to any documents or information 'vital' to their case, because none exists showing that O'Dea informed State Farm of the service and default issues." That is as circular as an argument gets: claim the documents do not contain any inculpatory evidence, refuse to let opposing counsel

(or the court) see them, and when the other party complains, cite a lack of prejudice because you have already told everyone that the documents do not contain any inculpatory evidence. Of *course* plaintiffs cannot point to any privileged documents that are "vital" to their case—they cannot point to *any* privileged documents, period, because they have never seen them. That argument does not warrant inclusion in an appellate brief.

¶ 218    Finally, State Farm says that Rule 191, the doctrine of privilege waiver, and the O'Dea and McCann affidavits are all irrelevant because we can affirm summary judgment on the independent ground that plaintiffs have marshalled no evidence to support their conspiracy claims. It is true that one way to move for summary judgment, sometimes called a "*Celotex*-type" motion for summary judgment, is to merely claim that plaintiffs have no evidence to prove their case, and thus summary judgment is appropriate. See *Jiotis v. Burr Ridge Park District*, 2014 IL App (2d) 121293, ¶ 25 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). While a more traditional motion for summary judgment cites affirmative evidence to refute the plaintiff's claim, in a *Celotex* motion, the defendant puts forth no affirmative evidence; it merely argues that plaintiff has no evidence to prove its case. *Id.*

¶ 219    But we do not read State Farm's motion for summary judgment as a *Celotex* motion, nor, as far as we can tell, did State Farm make any effort to present it as such. In its written motion addressing the conspiracy counts, State Farm wrote that "Plaintiffs provide no factual basis for their claims, and the record evidence establishes that State Farm did not enter into any agreement with O'Dea to engage in the alleged misconduct." While that first clause purports to raise an argument akin to a *Celotex* argument, the remainder focused on the affidavits of O'Dea and McCann, an offer of affirmative evidentiary support for summary judgment that is clearly *not* a *Celotex* argument.

¶ 220    In the accompanying memorandum of law in support of its motion for summary judgment, State Farm again noted that plaintiffs had no evidence of conspiracy but also argued that the McCann and O'Dea affidavits affirmatively disclaimed the existence of a conspiracy. Again, there is some allusion to a *Celotex* argument, but it was merged together with the more traditional summary-judgment argument by which a defendant puts forth substantive evidence to affirmatively disprove an element of plaintiff's claim. See *id.* State Farm never cited *Celotex* or any case discussing the application of a *Celotex* motion under Illinois law.

¶ 221    State Farm's reply in further support of its motion for summary judgment began immediately with State Farm's argument that "State Farm presented evidentiary facts that directly refute" the conspiracy claim (the McCann and O'Dea affidavits). State Farm then noted that it was "Plaintiffs' burden to come forward with facts to controvert that evidence." That is not a discussion of a *Celotex* motion for summary judgment; that is the more traditional motion for summary judgment. See *id.*

¶ 222    At oral argument, again, counsel for State Farm emphasized the McCann and O'Dea affidavits. There was no discussion of how a *Celotex* motion should be addressed. So we reject the premise that State Farm was raising a *Celotex* motion.

¶ 223    But even if we could construe this motion as a part-*Celotex*, part-traditional motion for summary judgment, we still could not rule in favor of State Farm.

¶ 224    "Whether we classify a defendant's motion for summary judgment as traditional, or as a *Celotex*-type motion, matters." *Id.* ¶ 26. It matters, among other reasons, because *Celotex* motions for summary judgment are disfavored before the close of discovery. See *Williams v. Covenant Medical Center*, 316 Ill. App. 3d 682, 691 (2000). Here, though the litigation had

been ongoing for several years, fact discovery had not closed. Indeed, no cutoff for fact discovery had even been imposed.

¶ 225    And plaintiffs loudly and repeatedly requested additional discovery after State Farm filed its motion for summary judgment, pursuant to Illinois Supreme Court Rule 191(b) (eff. Jan. 4, 2013). The Rule 191(b) affidavit requested, among several other things, (1) the documents on which McCann relied for his affidavit testimony and (2) the depositions of Mr. Dorsch and Ms. Pisanko, two members of O'Dea's law firm—that is to say, two members of the law firm obviously implicated by O'Dea's affidavit testimony that "neither my law firm nor I" notified State Farm of any controversy concerning service of process on those four subrogation lawsuits.

¶ 226    Those requests were obviously meritorious. The first request, for the documents on which McCann relied, was valid for a reason we have already given—the attached-documents requirement of Rule 191—as well as more generally because they were obviously relevant and were being openly referenced for the first time in this litigation, having previously been shielded by State Farm's claim of privilege.

¶ 227    The request for the depositions of Pisanko and Dorsch were meritorious, too. In particular, the deposition of Dorsch had previously been scuttled because plaintiffs were informed that Dorsch had moved to Ireland and was thus no longer available. In their Rule 191(b) affidavits, however, plaintiffs noted that their investigation revealed not only that Dorsch was back in the United States but that he was *working again at O'Dea's law firm*.

¶ 228    State Farm objected to the initial Rule 191(b) affidavit on the ground that it was signed by plaintiffs' counsel, not the named party-plaintiffs. The trial court thus struck the Rule 191(b) affidavit. But two of the plaintiffs then filed Rule 191(b) affidavits of their own, to overcome that technical deficiency, which adopted part and parcel the contents of the original, faulty Rule 191(b) affidavit. Those affidavits should have been honored, and the request for additional discovery (if nothing else, the two items we mentioned above) should have been allowed.

¶ 229    We would add, however, that if State Farm is attempting to now characterize its motion for summary judgment as one containing a *Celotex* argument, State Farm encounters the additional problem that compliance with Rule 191(b) is not generally required for *Celotex* motions filed before the close of discovery, as was the case here. See *Williams*, 316 Ill. App. 3d at 692 ("Although a plaintiff must comply with Rule 191(b) when a defendant has affirmatively shown that it is entitled to judgment, it is quite another matter to require such compliance when defendant, at an early stage, merely suggests that plaintiff is unable to prove his case. *** Rule 191(b) was adopted before *Celotex*-type motions were widely used and was never intended to apply to them."); *Jiotis*, 2014 IL App (2d) 121293, ¶ 29 ("to demand strict compliance with Rule 191(b)" before a plaintiff has conducted adequate discovery "turns Rule 191(b) from a procedural safeguard for the nonmovant into a tactical weapon for the movant").

¶ 230    It is unfair for State Farm to slightly reference a *Celotex* argument, cite no case law concerning that type of motion, and predominantly lead with a more traditional affirmative-evidence type of motion, and then claim on appeal that it is entitled to judgment based on a *Celotex* theory of summary judgment. But even if it could, a *Celotex* motion filed before the close of discovery, while plaintiffs validly identified the need for additional discovery, would have rendered summary judgment under a *Celotex* theory inappropriate, in any event.

¶ 231                                          d

¶ 232    For these reasons, State Farm waived its attorney-client communications by expressly describing them and by placing them affirmatively at issue in their attempt to seek summary judgment via the McCann affidavit. We limit that finding to the McCann affidavit. As we said above, though it seems clear to us that O'Dea was relying on documentary communications with State Farm for his testimony, as a technical matter he did not expressly cite to them. (We are not suggesting that O'Dea could have waived his client's privilege, but State Farm would have been waiving it by affirmatively submitting O'Dea's affidavit.)

¶ 233    What is left is defining the scope of that waiver of the attorney-client privilege. " ' "[T]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." ' " *Center Partners*, 2012 IL 113107, ¶ 67 (quoting *Rowe International Corp. v. Ecast, Inc.*, 241 F.R.D. 296, 301 (N.D. Ill. 2007), quoting *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349-50 (Fed. Cir. 2005)).

¶ 234    But here, our task is simple enough. As stated above, the privilege waiver was limited to McCann's affidavit, not O'Dea's. The only communications on which McCann relied were documents relating to the four named plaintiffs' subrogation claims. McCann referenced most notably the claim file materials and the claim activity logs. (It appears that the claim activity logs are contained within the claim file materials, but out of an abundance of caution, we reference them separately as McCann sometimes did.)

¶ 235    Any attorney-client communications contained within the claim file materials and the claim activity logs for the four named plaintiffs' subrogation cases (and only those four cases) are discoverable by plaintiffs, unredacted. We do not mean a "quick peek" as State Farm previously offered. We mean that plaintiffs are entitled to possession of those documents, unredacted.

¶ 236    The trial judge is free to entertain any requests from State Farm for a protective order concerning those now-discoverable communications. Under no circumstances could plaintiffs' counsel be denied them or be denied the right to use them substantively as evidence, of course. But if State Farm were to request any other limitation—to attorney's eyes only, to placing them under seal, or anything of that nature—we leave that to the trial court's discretion.

¶ 237                                    CONCLUSION

¶ 238    The order of summary judgment in State Farm's favor on the claim of malicious prosecution is affirmed. The dismissal of the abuse-of-process claims is reversed. The order of summary judgment on the claims of civil conspiracy is vacated. The cause is remanded for further proceedings consistent with this opinion.

¶ 239    Affirmed in part, reversed in part, and vacated in part; cause remanded.