**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250226-U

Order filed June 25, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| LOS 3 MARTINEZ CORPORATION, and LAURA YANETH DEL AGUILA, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | Appeal No. 3-25-0226 Circuit No. 24-LA-770 |
| | ) ) | |
| JOSE MARTINEZ and EMILY MARTINEZ, | ) ) | Honorable Bennett J. Braun, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Brennan and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  Directed finding at the close of plaintiffs' case was not against the manifest weight of the evidence.

¶ 2    Plaintiffs, Los 3 Martinez Corporation (L3M) and Laura Yaneth Del Aguila, appeal from a directed finding disposing of a conversion action against defendants, Jose Martinez and Emily Martinez. Plaintiffs argue the trial court erroneously interpreted Laura's decision to stop working at her restaurant as "an abandonment of property." For the reasons that follow, we affirm.

## I. BACKGROUND

### A. Pleadings

In September 2024, plaintiffs filed a two-count complaint charging Jose with conversion of L3M's property and Laura's property, based on "wrongful and fraudulent misrepresentations." Count 1 alleged Jose's acts and misrepresentations have amounted to the unauthorized taking of L3M's property. Count 2 alleged Jose's acts and misrepresentations amounted to the unauthorized taking of Laura's shares in L3M and the unauthorized control over her property.

Both counts incorporated the following allegations: (1) Jose filed false documents with the Illinois Secretary of State, appointing himself as L3M's president, and his daughter, Emily, as L3M's secretary and director; (2) Jose misrepresented that Laura no longer owned L3M to all its restaurant vendors, the landlord of the restaurant premises, and Chase Bank; (3) Jose appropriated L3M's Chase bank accounts; (4) Jose failed to keep the restaurant's lease payments current, leading to eviction proceedings and over $14,000 in rent arrears; and (5) Jose used and/or appropriated Laura's gaming license and failed to pay the State of Illinois to maintain Laura's liquor license, which he also used and/or appropriated without her consent.

Defendants answered the complaint, denying its material allegations.

### B. Bench Trial

The trial court held a bench trial on February 4, 2025. Though many trial exhibits were referenced in plaintiffs' case-in-chief, none were admitted into evidence. Laura was plaintiffs' sole witness, and her testimony comprised the entirety of the trial evidence.

#### 1. *Laura's Testimony*

Laura testified she owns the L3M restaurant and is L3M's sole shareholder. L3M's gaming and liquor licenses both list Laura as the sole owner. Laura purchased the restaurant in September

2

2021, with the help of her siblings. She paid $75,000 of the total purchase price, and four of her siblings contributed a total of approximately $90,000. Jose contributed $32,000, Sonia contributed $30,000, Eva contributed $15,000, and Christian contributed $12,000 or $15,000. Her siblings' contributions were loans, which she paid back.

¶ 12    Jose filed a document with the Secretary of State in August 2022 and another in July 2023, both listing Laura as L3M's director and secretary. According to Laura, she did not authorize Jose to make either of those filings.

¶ 13    The restaurant's sales were about $1.27 million in 2022 and about $1.18 million in 2023. During this time, Jose was the restaurant host; Sonia was a waitress; Laura's brother, Raul, was a cook; and Jose's daughter, Emily, worked parttime as a waitress. Laura, Jose, Sonia, Raul, and Emily were all restaurant employees. Laura gave Jose and Raul access to L3M's business bank account. She agreed to an arrangement in which Jose and Raul would become partners. This did not come to fruition, however, "[b]ecause [Jose] took everything." Jose would take "all the cash to his house" every day. "If you add all the money through these years," he took "like $300,000 in cash." Although she did not have proof of this unauthorized taking at the time of trial, Laura testified, "We can get proof."

¶ 14    Working with Jose was difficult. He "wanted to be the owner, the boss" simply because he was the eldest, while "forgetting that [Laura] was the owner." As a result of ongoing tensions, Laura told Jose and Raul she wished to sell the business to them. She did not agree on a price, however, and did not enter into a sales agreement. In May or June 2023, Laura stopped working at the restaurant. She was unhappy and told Jose to "call someone else to work because [she] wasn't going to be going to work anymore." She wanted to work in a food truck instead. At some

3

point, she told Jose to change the utility services into his and Raul's names, because she expected Jose and Raul to buy the restaurant.

¶ 15    On June 7, 2024, Laura sent Jose a text message instructing him to start transferring the company bills out of her name.

¶ 16    At some point, Laura lost access to L3M's bank account. Jose had "[re]moved [her] from the bank account and then he was going behind [her] back." Laura did not know how Jose was able to remove her from an account which she alone owned. She believed Jose must have presented the bank with "something from the Secretary of State." There was "not a lot of money" in the bank account when she lost access to it.

¶ 17    On July 2, 2024, Laura confronted Jose by text message about changes he made without her authorization. She informed him his actions were "not legal," as she had not signed anything or made any name changes. She wrote, "I gave you the opportunity to give me my money and to do the things right." She further wrote, "And you also removed me from my bank account without my authorization." In response, Jose wrote,"[B]ut you told me to make those changes." Laura replied, "I told you that I wasn't going to change anything until you give me my money."

¶ 18    On July 11, 2024, a document was filed with the Secretary of State on behalf of L3M. Laura did not authorize this filing. The document listed Jose and Emily as L3M officers; it did not include Laura's name anywhere. Even so, Laura did not have a problem with Emily.

¶ 19    On October 1, 2024, Jose sent Laura a text message invoking his authority as company president and urging Laura to do her part as owner to ensure the restaurant's continued operation.

¶ 20    On October 8, 2024, Jose closed the restaurant and took the menus and all the equipment, including "the grill, the fire, the steam table, [and] the cash register." Laura did not authorize Jose's

removal of restaurant property. Restaurant sales terminated abruptly and the restaurant has not operated since.

¶ 21    L3M leased the restaurant premises, and Laura guaranteed the lease. In October or November 2024, the landlord filed an eviction complaint against L3M due to unpaid rent. Laura later settled the eviction case with the landlord for $26,000, and she intends to reopen the restaurant at the same location.

¶ 22    Laura has since purchased new equipment for the restaurant.

¶ 23                              *2. Directed Finding*

¶ 24    After plaintiffs rested, defendants moved for a "directed verdict." The trial court granted the motion, finding only one of the four elements of conversion satisfied. See *Cruthis v. Firstar Bank, N.A.*, 354 Ill. App. 3d 1122, 1131 (2004). Specifically, the court found that although Laura had a right to the property, she did not establish an absolute and unconditional right to its immediate possession. The court noted Laura had "walked off the job" and the evidence indicated the business was to be transferred to Jose and Raul over time. The court found Laura did not make a demand for possession. It further found Laura had failed to demonstrate wrongful and unauthorized assumption of control, noting any assumption of control was "entirely with her consent given that she said 'I want out.' " Additionally, the court stated that even if Laura had met all four elements of conversion, she failed to prove damages. In so ruling, the court found Laura's testimony credible in some respects and not credible in other respects.

¶ 25    The court emphasized plaintiffs' case was limited by the pleadings. It observed that while an unjust-enrichment claim or constructive-trust claim could have survived a motion for directed finding, the testimony was "far afield" of what was required to support a conversion action.

¶ 26    Plaintiffs moved to reconsider, and the court denied the motion.

5

¶ 27    This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29    Plaintiffs contend the trial court erred in granting the motion for directed finding at the close of their case. Section 2-1110 of the Code of Civil Procedure provides, "In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor." 735 ILCS 5/2-1110 (West 2024). In ruling on this motion, the court conducts a two-prong analysis. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). First, the court determines as a matter of law whether the plaintiff has presented a *prima facie* case "by proffering at least some evidence on every element essential to [the plaintiff's underlying] cause of action." (Internal quotation marks omitted.) *Id.* If the plaintiff has established a *prima facie* case, the court proceeds to the second prong, where it sits as the trier of fact. *Id.* at 275-76. Under this prong, the court does not view the evidence in the light most favorable to the plaintiff. *Id.* at 276. Rather, it assesses witness credibility, weighs all the evidence, including evidence favoring the defendant, and draws reasonable inferences. *Id.* "This weighing process may result in the negation of some of the evidence presented by the plaintiff." *Id.* After weighing the evidence, "the court determines whether sufficient evidence remains to establish the plaintiff's *prima facie* case." *Id.* If the court finds in the plaintiff's favor, the trial continues. *Id.* If, however, the court finds in the defendant's favor, "a judgment dismissing the action shall be entered." 735 ILCS 5/2-1110 (West 2024). A second-prong ruling will not be reversed unless it is against the manifest weight of the evidence. *Cryns*, 203 Ill. 2d at 276.

¶ 30    Here, the trial court entered a second-prong ruling. It assessed Laura's testimony, finding some parts credible and others not, and it drew inferences therefrom. Thus, we consider whether its judgment was against the manifest weight of the evidence. *Id.*

6

¶ 31    "To prove conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114 (1998). The failure to establish any one of these elements defeats the claim.

¶ 32    Plaintiffs' conversion case is hindered by its reliance on a vague concept of property. "The subject of conversion is required to be an *identifiable object of property* of which the plaintiff was wrongfully deprived." (Emphasis added.) *Kovac v. Barron*, 2014 IL App (2d) 121100, ¶ 97. "[C]onversion lies only for personal property which is tangible, or at least represented by or connected with something tangible." *In re Thebus*, 108 Ill. 2d 255, 260 (1985). The complaint alleged Jose appropriated L3M's property, including bank accounts and Laura's liquor and gaming licenses. Its use of the term "property" apparently also included Laura's shares in L3M, as well as L3M's lease agreement, "vendor contracts," "clients," "resources and records."

¶ 33    These allegations principally concern intangible rights and interests. Although Laura testified about various filings and records, no documentation was admitted into evidence. Generally, "a document must be offered by its proponent and admitted into evidence by the trial court before it may be considered as evidence." *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 21. Even when a witness reads from a document or offers input on a document, "it is still the document supplying the proof, not the witness." *Selby v. O'Dea*, 2020 IL App (1st) 181951, ¶ 164. Thus, before a document may be used as proof of a fact, it must first be introduced into evidence. *Id.* In the absence of documentary evidence giving form to otherwise intangible rights or interests, plaintiffs failed to establish the existence of property subject to conversion.

7

¶ 34    Additionally, plaintiffs' allegation that Jose appropriated L3M's Chase accounts did not relieve them from identifying the money allegedly converted. While money need not be earmarked to be the subject of conversion, "it must be capable of being described as a specific chattel." *In re Thebus*, 108 Ill. 2d at 260. Moreover, "[a] right to an indeterminate sum is insufficient to maintain a cause of action in conversion." *Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.*, 346 Ill. App. 3d 996, 1004 (2004).

¶ 35    Plaintiffs never clearly identified the purportedly converted bank funds. The complaint broadly alleged Jose appropriated L3M's "Chase bank accounts," and Laura offered no meaningful details to substantiate this allegation. She only testified there was "not a lot of money" in the restaurant account before she lost access to it. Plaintiffs did not admit into evidence any bank records listing the restaurant's account number or account balance. Plaintiffs did not even claim Jose withdrew funds from the restaurant account. The trial court could reasonably find the evidence did not establish conversion of a specific sum from the "Chase bank accounts."

¶ 36    At trial, Laura testified to matters not pleaded in the complaint. Specifically, she testified that Jose took "like $300,000 in cash" over the years, and that he closed down the restaurant and took with him the menus and various equipment, including a grill, steam table, and cash register. Even considering this testimony, the trial court's entry of a directed finding was proper.

¶ 37    Laura's testimony that Jose took "like $300,000 in cash" was far too speculative and incomplete to prove conversion of identifiable funds. It was accompanied by her concession that she did not have proof at trial, though she believed proof could later be obtained. A plaintiff must prove her case at trial; she may not merely assert proof can later be obtained.

¶ 38    Moreover, Laura's testimony that Jose removed restaurant equipment cannot support a conversion action. Plaintiffs failed to provide any evidence of a prior demand for the equipment's

8

return. This evidentiary deficiency is fatal to any claim that Jose converted the restaurant equipment. See *Cirrincione*, 184 Ill. 2d at 114.

¶ 39 On appeal, plaintiffs argue the trial court improperly treated Laura's unwillingness to work at the restaurant as "an abandonment of property" and "acquiescence" to Jose's subsequent actions, including his taking of the restaurant's contents. (Plaintiffs acknowledge the court did not explicitly base its ruling on an abandonment theory.)

¶ 40 These arguments do not address the deficiencies that independently defeat plaintiffs' conversion action. Assuming the evidence did not support an abandonment or "acquiescence" theory, plaintiffs were still required to prove every element of conversion. *Id.* They did not do so. Their evidence, consisting solely of Laura's testimony, fell short of establishing even a *prima facie* case for conversion. Plaintiffs shifted between distinct categories of alleged property interests— some of which were intangible assets—without sufficient identification and without establishing the elements of conversion as to any discrete interest. The trial court was not required to find conversion satisfied on such an imprecise theory, particularly one lacking in documentary support.

¶ 41 Thus, because the court's judgment was not against the manifest weight of the evidence, we affirm the directed finding in defendants' favor.

¶ 42                                    III. CONCLUSION

¶ 43 The judgment of the circuit court of Will County is affirmed.

¶ 44 Affirmed.